[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-12765

_____

DAVID B. WATKINS,

Plaintiff-Appellant,

*versus*

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cv-00794-VMC-MRM

_____

Before BRANCH, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

David Watkins appeals the district court's order affirming the Social Security Administration ("SSA") Commissioner's decision denying his application for disability insurance benefits ("DIB") under 42 U.S.C. § 405(g). He argues that (1) the ALJ erred in weighing the medical opinion evidence; (2) the ALJ erred in weighing his subjective complaints; and (3) the ALJ erred in determining his residual functional capacity ("RFC"). After careful review, we affirm.

## I.    Background

### A. Procedural History Leading Up To The Decision On Review

In October 2012, Watkins, then age 57, applied for DIB with a disability onset date of March 24, 2012.[1] He alleged that (1) he was ultimately terminated from his job as a chemical engineer because of disabling anxiety and major depression, and (2) he was no longer able to work because of those conditions. Watkins indicated in his self-prepared function report that his depression and anxiety affected "all facets" of his life and caused problems with concentration, focus, memory, and understanding and following instructions; caused frequent absences from work; caused crying, worries, constant fears, problems sleeping, and social withdrawal; impaired his ability to "communicate thoughts properly"; and at

---

[1] Watkins was represented by counsel throughout all stages of the underlying agency proceedings and in the proceedings that followed in the district court.

times caused problems with personal care and grooming and the need for reminders to take medications or do certain tasks. He alleged that he was a "shut in" and did not have any interest in going out. When he needed to, however, he could drive and go out alone, and he regularly left the house for appointments and to shop for necessities.

After an independent review of the application and supporting materials by agency consultants, the Social Security Administration denied Watkins's application at the initial stage and on reconsideration. Watkins then requested and received a hearing before an administrative law judge ("ALJ"). The ALJ denied Watkins's application on August 28, 2014, finding Watkins not disabled. Watkins requested review of the ALJ's decision by the Appeals Council, but the Appeals Council denied the request.

Thereafter, Watkins filed a complaint in the district court, arguing, in relevant part, that the ALJ failed to properly weigh the medical opinion evidence. A magistrate judge agreed, concluding that the ALJ had failed to support with substantial evidence his rejection of Watkins's treating physician's opinion. Accordingly, the magistrate judge reversed the decision of the Commissioner and remanded the claim for further proceedings on September 27, 2017.[2] The Appeals Council then remanded the claim to a new ALJ

---

[2] Watkins consented to a magistrate judge presiding over the case instead of a district court judge.

for a new hearing and decision. The new hearing took place on September 11, 2019.

### B.  Testimony from the Second Hearing

Watkins testified that he was 64 years' old. Between 2012 and 2017 (the relevant time frame for his disability benefits),[3] he experienced depression and anxiety, leading him to become homeless and unable to work. He was admitted into a residential rehabilitation program through the Department of Veterans Affairs ("VA"), where he stayed for approximately seven months. He admitted that he also had an alcohol abuse problem prior to losing his job, and he voluntarily participated in a 90-day rehab program. He stated that he was drinking heavily "up until [he] lost [his] job." Since rehab, however, he has "had a couple of beers here and there in 2014 on the 4th of July." Doctors considered him "an alcoholic by their standards," but he did not consider himself to be one. He stated that he was not drinking anymore.

Watkins testified that he most recently worked in several engineering roles for a chemical plant—he started as an electrical engineer; then he transitioned to a scheduling engineer; he then moved up to being the "master scheduler" in charge of coordinating employee, contractor, equipment, and tool

---

[3] Disability insurance benefits may not be paid unless the claimant was disabled while he met the insured status requirements of 42 U.S.C. § 423(c). *See* 42 U.S.C. § 423(a)(1)(A). Thus, the ALJ in this case examined whether Watkins was disabled between his alleged onset date of March 2012 and his date last insured of December 31, 2017.

schedules; and finally he was a process safety engineer in charge of ensuring "everything was up to code."[4]  He called out "sick a lot because of [his] anxiety and [his] depression," and self-medicated with alcohol.  Although Watkins was no longer drinking presently, his anxiety and depression were worse.

Watkins explained that he had always struggled with anxiety and depression, but as he got older, he was unable to maintain the "mask" needed to keep working and no longer had the energy to fight off his fears and depression.  He had been on benzodiazepines for 20 years off and on.  However, those types of medications would work for only a short time and ultimately caused him more depression and anxiety.  He had also tried various anti-depressants, but none of them worked.  He explained that he was hospitalized once for a panic attack, but he had since learned to recognize that a panic attack is not a heart attack, and that if the symptoms subside, he does not need to go to the hospital.  He explained that his anxiety and his medications made it difficult to focus because of constant racing thoughts.  He explained that his depression comes in cycles approximately three times each year and lasts for a period of several weeks to several months.  Watkins confirmed that he had never attempted suicide and had not had suicidal thoughts since 2012.

A vocational expert ("VE") then testified that Watkins's

---

[4] He testified that prior to his employment at the chemical plant, he had previous quality control engineering jobs with other companies, but he lost those jobs because of his anxiety and depression.

prior vocations were classified as light, skilled work. The VE opined that a hypothetical individual "limited to understanding and carrying out no more than simple, routine, repetitive, unskilled tasks" could not perform Watkins's past relevant work. The ALJ then asked whether there were any jobs in the national economy that a hypothetical individual, approaching retirement age, with Watkins's level of education could perform, where such an individual was "limited to medium level of exertion," with various limitations including no climbing; no heights; avoidance of extreme temperatures; no operation of heavy machinery; and "limited to understanding and carrying out simple, routine, repetitive, unskilled tasks, with the ability to make only basic decisions and adjust to simple changes in a work setting, with interaction with others, including the general public, co-workers, and supervisors limited to occasional." The VE testified that such a person would be able to work as a hand packager, a warehouse worker, or a cook's helper, and that all of these positions were available in the national economy.

The VE then testified that the same hypothetical individual would not be able to work any of those jobs if he would be off task 15 percent of the time and absent from work two to three times a month. On further examination by Watkins's counsel, the VE explained that "the baseline tolerance for time off task" at a given job is largely dependent on the employer, but ranges from 3 to 8 percent. He further opined that an individual who required frequent supervision, "meaning up to two-thirds of the workday," would likely not be able to maintain gainful employment in the

previous roles that the VE identified.

### C.  The Relevant Medical Evidence

In addition to the testimony provided at the second hearing before the ALJ, the relevant medical evidence included the following.  On March 25, 2012, Watkins admitted himself to Palm Partners, LLC for treatment for alcohol dependency, noting that he had relapsed.[5]  At that time, he reported symptoms of insomnia, sweating, tremors, and that he had been suffering depression for the last 20 years.  Watkins reported taking prescribed medications for anxiety, depression, and ADHD.  The notes from his admission indicate that Watkins had a "neat/clean" appearance and was alert and oriented with normal speech patterns and affect.  His thought process was logical and coherent, his short- and long-term memory were normal, and he was cooperative and attentive, but his judgment was impaired.  The evaluation indicated that he had "severe" stressors in his life, including "[p]roblems with [p]rimary [s]upport," "[p]roblems related to social environment," and "[e]conomic problems."  He completed a detox program at Palm Partners.

Watkins saw a general practitioner several times between June and July 2012 for depression and anxiety and adjustments of medications.  He reported a concern that he was having a bad reaction to Seroquel, one of the depression medications that he had

---

[5] Records revealed that Watkins had completed a prior treatment program at Palm Partners for alcohol and benzodiazepine dependency in 2011.

been prescribed while at Palm Partners; difficulties with memory, sleep, and concentration; and feeling depressed with intermittent severe episodes of anxiety. Nevertheless, activities of daily living ("ADLs") were normal as were his physical exams. He also denied suicidal ideation or any history of attempts. His doctor discontinued some medications and adjusted others. Watkins noted minor improvement with the medication adjustments at his visits in July 2012, and he noted that he had a pending appointment with a psychiatrist, Dr. Carroll. His doctor recommended that Watkins "stay off work at least until he [was] able to see psychiatrist."

Watkins first saw Dr. Carroll on August 14, 2012. At that time, Watkins indicated that he was employed but currently on short term disability through the end of September. He indicated that he did not "feel ready to return to work" and was "working to roll into [long term disability]." He reported no incidents of suicidal or homicidal ideation or risk of self-harm. Dr. Carroll noted that Watkins's appearance was "disheveled"; his psychomotor function "restless"; his affect "tearful/sad" and anxious; and his mood depressed and anxious. But his judgment was logical and his thought process organized and relevant, and he was completely oriented with appropriate insight. She diagnosed him with alcohol dependence, major depressive disorder (severe), and generalized anxiety disorder. She discontinued some medications and began others and requested to see him again in three to four weeks.

Dr. Carroll saw Watkins again for a follow-up on September 6, 2012. Watkins reported that he could not take one of the prescribed depression medications due to side effects, and she again adjusted his medication regime. At this visit, she documented that he had a normal appearance and was fully alert and oriented and cooperative, with clear and coherent speech, but his speech was slow and he exhibited retardation of psychomotor function. Additionally, his mood was "terrible," and he exhibited an anxious affect. His memory and concentration were impaired, and his judgment was poor.

Following the September 6, 2012 visit, Dr. Carroll completed a narrative report statement. In this statement, she indicated that Watkins reported prior diagnoses of, and treatment for, major depressive disorder, generalized anxiety disorder, and alcohol dependence. He had been placed on short-term disability "due to the severity of his symptoms." He frequently self-medicated with alcohol and had "experienced severe depressive episodes, agitation, extreme isolation, suicidal thoughts[,] and paralyzing anxiety attacks" over the previous two years. These symptoms often interfered with his ability to perform ADLs. He experienced the most severe symptoms during times "when he [was] trying to maintain employment or [was] under an inordinate amount of stress." Watkins reported that his employment was "a large source of stress" and he felt "incapable of returning to the work place."

Watkins saw Dr. Carroll approximately a month later for continuing symptoms of anxiety and depression. Watkins indicated during this visit that his request for long term disability had been denied and that he intended to apply for DIB. Dr. Carroll documented his appearance as normal with good eye contact and normal motor function. He was cooperative with logical and organized thoughts, and alert and fully oriented with clear and coherent speech. But he reported being anxious and depressed and Dr. Carroll documented that he had a "constricted" affect, and his memory and concentration were impaired. Watkins's judgment improved from "poor" to "fair." Dr. Carroll again adjusted his medications.

In November 2012, Dr. Carroll completed a "psychiatric/psychological impairment questionnaire" in relation to Watkins's application for DIB benefits. She indicated that Watkins suffered from alcohol dependency, major depression, and generalized anxiety disorder. She asserted that these diagnoses were supported by the following clinical findings: "poor memory"; "appetite disturbance with weight change"; "sleep disturbance"; "mood disturbance"; "social withdrawal or isolation"; "substance dependence"; "anhedonia or pervasive loss of interests"; "generalized persistent anxiety"; and "feelings of guilt/worthlessness." She listed Watkins's primary symptoms as: "(1) continued alcohol use"; "(2) depressed mood, fatigue, poor cognitive function"; and "(3) persistent generalized anxiety."

Based on Watkins's diagnoses and symptoms, Dr. Carroll opined that Watkins's ability to understand and remember "work-like procedures" and "one or two step instructions" would be "moderately limited" as would be his ability to carry out such instructions. Relatedly, Watkins's ability to understand, remember, and carry out detailed instructions as well as his ability to maintain concentration for extended periods of time and maintain regular attendance and punctuality were "markedly limited." Similarly, she opined that Watkins's "ability to make simple work related decisions" and to complete a normal workweek without experiencing disruptions due to his psychological symptoms was "markedly limited."

Dr. Carroll also found that Watkins's symptoms "moderately limited" his ability to interact with the general public and his coworkers and to adapt to changes in the workplace. Additionally, Dr. Carroll indicated that his ability to be aware of hazards in the workplace and respond appropriately, his ability to travel, and his ability to set realistic goals and plan independently were only "mildly limited." Dr. Carroll noted that she was unable to comment on Watkins's ability to "tolerate work stress" because Watkins had not worked since she began treating him. She acknowledged that Watkins had good days and bad days, but she estimated that he would likely be absent from work "more than three times a month" due to his conditions. Finally, Dr. Carroll noted that Watkins "need[ed] to work to attain [and] maintain sobriety in order to see improvement in his mood and anxiety symptoms. Planning to start behavioral therapy[.]"

Watkins saw Dr. Carroll again on December 5, 2012, throughout 2013,[6] and multiple times between January and May 2014.[7] At times Watkins indicated his was doing better and at other times worse, and he frequently requested changes to his medications during these visits or expressed concerns with side effects of current medications, and Dr. Carroll frequently adjusted his medications. Dr. Carroll's observations of Watkins during these periods indicated appropriate grooming; fair to good eye contact; a cooperative attitude; logical and organized thought processes; alertness and proper orientation; occasional retardation of psychomotor function, but unremarkable (*i.e.*, normal function) the majority of the visits; an abnormal mood and affect; clear and coherent but occasionally slow and soft speech; fair judgment; fair insight; low risk of self-harm or violence against others; no suicidal ideation; and impaired or poor memory and concentration. Her notes continuously indicated that Watkins needed to focus on maintaining sobriety.

In June 2014, Dr. Carroll completed a narrative statement summarizing Watkins's diagnoses, symptoms, and functional capacity. Her summary was virtually identical to the answers she provided in the November 2012 medical source statement.

---

[6] In 2013, Watkins saw Dr. Carroll on March 13, May 7, June 13, July 8, August 12, September 30, October 27, November 25, and December 30.

[7] In 2014, Watkins saw Dr. Carroll on January 9, January 28, February 28, April 7, April 30, and May 28.

Around this same time, Watkins's counsel referred him for a psychological evaluation by Dr. Benjamin Cohen in support of his DIB application. Dr. Cohen evaluated Watkins by conducting a clinical interview and a mental status examination, reviewing Watkins's treatment records from Dr. Carroll, and administering certain tests. Dr. Cohen's mental status observations of Watkins during the evaluation included that Watkins appeared well groomed; was punctual; made good eye contact; had a depressed mood with congruent, tearful affect; had normal speech; had goal-oriented thought processes; was alert and oriented to time, place, and situation; had average concentration and attention span; and had fair insight and judgment. Watkins denied suicide attempts and ideation, but reported nervousness, memory problems, poor appetite, loneliness, insomnia, feelings of guilt and worthlessness, and chronic worry since childhood. Watkins was able to complete simple arithmetic in his head, spell a given word backwards and forwards, and "was able to complete serial 3's from 20 with one mistake." Dr. Cohen indicated that Watkins's fund of knowledge was fair, he was of average intelligence, and his memory was below average, but not impaired. Based on his review, Dr. Cohen opined in his evaluation summary and recommendations that Watkins's "psychological symptoms would cause mild impairment in his ability to perform work-related mental activities (i.e., concentration and memory) and moderate to severe impairment in his ability to socialize and adapt at work." Further, "he would be at moderate risk for psychological decompensation in the future if subjected to job-related stressors."

Dr. Cohen then completed a medical source statement, identifying the following symptoms as supporting Watkins's diagnoses: (1) blunt affect; (2) emotional lability; (3) feelings of guilt or worthlessness; (4) suicidal ideation; (5) difficulty thinking or concentrating; (6) generalized anxiety; (7) pervasive loss of interests; (8) appetite disturbances/weight change; (9) fatigue; (10) pathological dependence; (11) psychomotor retardation; (12) social isolation/withdrawal; and (13) insomnia. He also noted that Watkins reported "bouts of depression that last[ed] for several weeks." And Dr. Cohen opined that Watkins had "moderate-to-marked" limitations in his ability to: (1) perform at a consistent pace; (2) accept instructions and respond appropriately to criticism from supervisors; (3) get along with coworkers or peers without distracting them; (4) set realistic goals; and (5) make plans independently. Dr. Cohen also opined that Watkins had "moderate" limitations in his ability to: (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) perform activities within a schedule and consistently be punctual; (6) sustain an ordinary routine without supervision; (7) work with or near others without being distracted; (8) ask simple questions or request assistance; and (9) respond appropriately to workplace changes. Dr. Cohen estimated that Watkins would be absent from work more than three times per month as a result of his symptoms.

23-12765                Opinion of the Court                15

Dr. Carroll continued to treat Watkins throughout 2014 and 2015.[8] On February 9, 2015, Dr. Carroll prepared a narrative report in support of Watkins's request for reconsideration of the initial denial of his application for DIB benefits. Dr. Carroll stated that, over the previous five years, Watkins "experienced severe depressive episodes, agitation, extreme isolation, suicidal thoughts and paralyzing anxiety attacks at varying intervals." She indicated that "[h]is most severe episodes" were triggered when he faced "interpersonal stressors," such as when his brother almost died due to a medical emergency. She maintained that Watkins struggled to perform ADLs due to his symptoms, and he felt "incapable of returning to the work place." Dr. Carroll agreed that Watkins "[was] not capable of maintaining a 40 hour work week" due to his poor coping skills. She noted that "[a]lthough he [had] been able to function well at most visits with [her], he [had] spiraled and struggled significantly over the past year. . . . finding it harder and

---

[8] Although the record contains no notes from office visits between May 2014 and July 2015, Dr. Carroll's lengthy medication record for Watkins contains entries during that time period. Therefore, it is clear that she treated Watkins during that time frame. Office visit notes are available for July through October 2015. As with prior visits, Watkins frequently expressed concerns with his medications during these visits, and Dr. Carroll adjusted his medications in response. Additionally, as with prior visits, Dr. Carroll's observations of Watkins during these periods indicated appropriate grooming; fair to good eye contact; a cooperative attitude; logical and organized thought processes; alert and fully oriented; retardation of motor function; an abnormal mood and affect; clear and coherent but occasionally slow and soft speech; fair or poor judgment; no suicidal ideation; low risk of self-harm or violence against others; and impaired memory and concentration.

harder to cope with life." She maintained that his "prognosis for recovery [was] poor to guarded."

In May 2015, Dr. Carroll completed another medical source ("mental impairment questionnaire") statement. She checked many of the same signs and symptoms that supported Watkins's diagnoses as she did in the November 2012 medical source statement. However, this time, she also indicated that Watkins had "suicidal ideation," "past suicide attempt(s)," "impulsive or damaging behavior," "intense and unstable interpersonal relationships," and agitated psychomotor function (but not retardation of psychomotor function). She further indicated that Watkins was markedly limited in many areas of function.

Watkins also received treatment from the VA intermittently between 2012 and 2017. In notes from the VA regarding a visit on December 21, 2012, Watkins reported that his anxiety and depression were "getting better but [he] tend[ed] to have issues making new friends." He stated he recently visited his brother and "felt as good as he[']s ever felt." He also "felt improvement with his Xanax and he [was] now able to engage in conversations with people and [had] [a] []positive point of view on life." Progress notes from a June 2013 visit indicated that Watkins stated "he [had] been doing well" and that he was following an exercise regimen to help work out his anxiety.

On June 6, 2014, Watkins saw a doctor at the VA for another matter and reported increased depression since the death of his father. He reported experiencing depressed mood, loss of interest,

and decreased appetite.  He also stated that he was not currently taking any anti-depressants and did not want to take any because of the side effects; instead, he took only Xanax.  Five days later, Watkins went to the VA hospital emergency room due to heart palpitations following two panic attacks and his consumption of two "airline bottles" of alcohol.  He also reported experiencing severe depression.  At a follow-up the next day, Watkins reported struggling with recent bouts of depression and daily panic attacks due to the passing of his father and his brother's health issues.  He also reported feeling overwhelmed with paperwork related to his DIB application and experiencing sleep issues.  He denied any suicidal ideation or history of suicide attempts.  He also denied experiencing "decreased concentration, interest, energy, appetite, feelings of guilt, helplessness, or hopelessness."  According to the notes, Watkins appeared "well groomed" with good eye contact; "no psychomotor retardation/agitation"; alert and fully oriented; normal speech pattern; logical and organized thought process; "grossly intact" recent and long-term memory; and adequate attention and concentration.

On April 13, 2015, Watkins requested admission to a treatment program at the VA, reporting that he was not doing well, was "dangerously close to drinking again," and that he was experiencing worsening anxiety and depression symptoms due to ineffective medications and his brother's recent hospitalization. He denied any suicidal ideation or attempts.  As with prior visits, Watkins's mental status exam indicated that he appeared well-groomed, made good eye contact, was cooperative, and had

organized thoughts. His mood was congruent, and he was properly oriented to time and place. "All memory functions appear[ed] to be grossly intact." It was recommended that he participate in an outpatient substance abuse recovery program.[9]

In a September 2015 psychiatric evaluation by the VA, Watkins reported experiencing depressed mood, loss of interest, sleep issues, feelings of worthlessness and guilt, and problems with concentration. He also reported some suicidal ideation stating that in June 2015 he had thoughts of "driving [his] motorcycle out to the desert and letting [himself] starve to death," but he denied any current ideation and denied any history of attempts. His mental status exam indicated a depressed, anxious mood with congruent affect; clear, normal speech; good grooming; good eye contact; alertness; and no psychomotor retardation or agitation.

In November 2015, Watkins reported feeling hopeless and depressed, but denied any suicidal ideation. He indicated he was "ok," but that he needed more therapy, assistance with substance abuse, and housing. He reported a life-long history of depression problems that "last days and weeks on end," during which he experienced "sadness, anhedonia, weight gain, sleep disturbance . . . , low energy, feelings of worthlessness and guilt, and concentration problems." However, his recent symptoms had not been "as intense" as in the past. He "adamantly denie[d] any suicidal . . . ideation[]." His mental status exam indicated "no acute

---

[9] It does not appear that Watkins participated in the program.

distress"; good eye contact; a pleasant, well-groomed appearance; normal psychomotor function; normal speech; "grossly intact" memory and concentration; no suicidal ideation; and constricted affect and depressed mood.[10]

At a follow-up on January 22, 2016, Watkins reported a stable mood and mild improvement in his depression and anxiety symptoms due to new medications, but he expressed concerns about stressors surrounding the sale of his trailer and his future housing options given his lack of financial resources. And at a visit on February 8, 2016, Watkins reported that he was adjusting his medications as part of his treatment program, and he stated he had a stable mood and "denie[d] any significant depressive symptoms at [that] time." His mental status exam indicated "no acute distress"; good eye contact; a pleasant, well-groomed appearance; normal psychomotor function; normal speech; "grossly intact" memory and concentration; no suicidal ideation; and constricted affect and self-reported "okay" mood.

In the spring of 2017, Watkins entered a residential rehabilitation program through the VA. He was diagnosed with benzodiazepine dependence and provided with many forms of treatment and counseling. He was discharged to a transitional housing program in October 2017, at which time he indicated the

---

[10] In December 2015, Watkins reached out to the VA seeking help with obtaining employment.

program had helped him develop and implement coping skills, "work on managing anxiety," and maintain sobriety.

VA records from multiple encounters in August, September, October, November, and December 2017 indicate that Watkins was stable, participating in the VA's therapy programs, seeking advice on obtaining employment, and applying for jobs. He denied any current struggles with alcohol or suicidal ideation. He reported overall improvement in his moods but continued anxiety and panic attacks, and at times still reported depression, loss of interest, racing thoughts, and insomnia.

Lastly, Watkins presented evidence that in October 2017 he complained of neck pain, which had been worsening over the prior four months. An MRI study revealed "mild lower cervical levocurvature," disc degeneration at certain vertebrae in the cervical spine, "moderate/severe bilateral foraminal stenosis," and "[m]oderate canal narrowing." Despite these results, a physical exam revealed full active and passive range of motion of the cervical spine and shoulders without pain with full motor and grip strength. As a result, conservative treatment was recommended including applying a hot/cold wrap to the neck, a chiropractic consultation, physical therapy, and use of a muscle relaxer.

### D. The ALJ's Decision

Employing the SSA's five-step sequential evaluation process for determining whether a claimant is disabled, the ALJ denied

23-12765                Opinion of the Court                21

Watkins's application.[11]  At steps one and two, the ALJ found that Watkins had not engaged in substantial gainful activity since March 24, 2012, and was severely impaired by his "moderate generalized anxiety disorder, major depression, and long history of alcohol dependence." The ALJ also found that, beginning in August 2017, Watkins was severely impaired by "cervical spine degenerative changes," which the ALJ determined resulted in certain exertional and physical limitations.  At step three, the ALJ determined that Watkins's impairments alone or in combination did not meet or medically equal any listed impairment under the relevant Social Security regulations.  At step four, the ALJ determined that:

> from [Watkins's] alleged onset date of March 24, 2012 through July 31, 2017, the claimant had the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations: was limited to work that is simple as defined in the Dictionary of Occupational Titles (DOT) as specific vocational preparation (SVP) levels 1 and 2, routine and repetitive tasks in a work environment free of fast-paced production

---

[11] The determination process involves the following five steps: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether he "has a severe impairment or combination of impairments"; (3) if so, whether that impairment, or combination of impairments, meets or equals the medical listings in the regulations; (4) if not, whether the claimant can perform his past relevant work in light of his residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

requirements which is defined as constant activity with work tasks performed sequentially in rapid succession; involving only simple work-related decisions; with few, if any, workplace changes; and no more than occasional interaction with the general public, co-workers and supervisors. In addition, beginning on August 1, 2017 through the date last insured of December 31, 2017, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except he was unable to climb long vertical ladders, scaffolds or ropes, or at open unprotected heights; he had to avoid extreme heat temperatures and operation of dangerous machinery; and was unable to work where alcoholic beverages were available. He was further limited to understanding and carrying out simple, routine, repetitive unskilled tasks, with the ability to make basic decisions and adjust to simple changes in the work setting, and limited to only occasional interaction with others, including the general public, coworkers, and supervisors.[12]

In reaching the determination that Watkins had the RFC to perform medium-level work that is defined as simple, the ALJ

---

[12] The physical limitations noted by the ALJ beginning August 1, 2017 through December 31, 2017, appear to relate to Watkins's neck injury. Watkins does not challenge the physical limitations found as part of the RFC determination. Instead, he focuses solely on the mental health aspects of his claim and how those health issues render him totally disabled. Accordingly, this opinion focuses on the mental health aspects as well.

found that Watkins's medically determinable impairments could reasonably be expected to cause his alleged symptoms (problems with sleeping, concentration, focus, memory, excessive worry, fear, depression, and impairments in his ability to care for himself, among others), but that his "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." In support of this conclusion, the ALJ summarized the medical records from the various providers at length, noting that, despite Watkins's long history of anxiety, depression, and alcohol dependence, his mental status exams during these visits indicated that he was alert and lucid with good eye contact; cooperative; had a well-groomed appearance; had normal speech activity and was coherent with logical, goal-directed thought processes; he did not have suicidal ideations; he was able to interact appropriately with doctors and staff; and had at most a mild impairment in concentration and memory with fair judgment and insight. The ALJ explained that these findings were consistent with his observations of Watkins's demeanor and appearance at the hearing as well.

The ALJ further noted that the records "failed to reveal any formal thought or psychotic disorder, and [Watkins's] treatment consisted primarily of medication management along with counseling, with reports of improvement in his symptomatology." Thus, the ALJ concluded that Watkins's "alleged symptoms and restrictions are exaggerated, as they are not supported by the

medical signs and/or diagnostic study findings to account for the total level of disability alleged."

The ALJ gave "little weight" to Dr. Carroll's opinions because, in addition to her progress notes being "mostly illegible," her opinions were "unsupported and inconsistent with the overall medical evidence of record." For instance, the ALJ pointed out that Dr. Carroll documented in treatment notes that Watkins had no suicidal ideations, had an appropriate appearance, was cooperative, had logical thought processes, and clear and coherent speech, but then she stated the opposite in the formal questionnaires and evaluations. Furthermore, her opinions were contrary to evaluations by persons at the VA and Dr. Cohen—all of which indicated that Watkins was functioning at a much higher level than opined by Dr. Carroll.

As for Dr. Cohen, the ALJ gave his opinion "only partial weight" because Dr. Cohen evaluated Watkins on only one occasion and the evaluation did not "reveal objective findings supporting [the noted] signs of suicidal ideations, difficulty thinking or concentrating, generalized or persistent anxiety, anhedonia, appetite disturbances, decreased energy, psychomotor retardation, social withdrawal, or insomnia." Similarly, Dr. Cohen's statement that Watkins had "bouts of depression that last[ed] for several weeks" was unsupported by objective medical findings because he evaluated Watkins only once, which necessarily meant that this statement was based on Watkins's subjective statements. Finally,

the ALJ noted that Dr. Cohen's opinion was also inconsistent with the records from the VA.

Next, the ALJ determined that Watkins could not perform past relevant work. But, at step five, the ALJ determined that Watkins could perform other jobs in the national economy such as a hand packager, a warehouse worker, or a cook's helper. Consequently, the ALJ found that Watkins was not disabled.

Watkins requested discretionary review of the ALJ's decision by the SSA's Appeals Council, which was denied.

### E. District Court Proceedings

In April 2022, Watkins filed a complaint in the district court, arguing, in relevant part, that (1) the ALJ failed to properly weigh the medical opinion evidence of Dr. Carroll and Dr. Cohen; (2) the ALJ erred in determining Watkins's RFC; and (3) the ALJ failed to properly evaluate Watkins's subjective testimony. A magistrate judge issued a report and recommendation ("R&R") recommending that the Commissioner's decision be affirmed. The district court adopted the R&R over Watkins's objections and affirmed the denial of benefits. Watkins timely appealed.

## II.  Standard of Review

"When, as in this case, the ALJ denies benefits and the [Appeals Council] denies review, we review the ALJ's decision as the Commissioner's final decision." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). "Our review of the Commissioner's decision is limited to whether substantial evidence supports the decision

and whether the correct legal standards were applied." *Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338 (11th Cir. 2021). "[W]e review *de novo* the legal principles upon which the Commissioner's decision is based," and "we review the resulting decision only to determine whether it is supported by substantial evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). "Substantial evidence is less than a preponderance, and thus we must affirm an ALJ's decision even in cases where a greater portion of the record seems to weigh against it." *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1103 (11th Cir. 2021) (quotation omitted); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) ("Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." (quotations omitted)).

"We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." *Winschel*, 631 F.3d at 1178 (alteration in original) (quotation omitted). "Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Crawford*, 363 F.3d at 1158–59 (quotation omitted).

## III.    Discussion

Watkins argues that (A) the ALJ failed to properly weigh the medical opinion evidence; (B) the ALJ failed to properly evaluate his subjective statements; and (C) the ALJ failed to properly determine his mental RFC. We address each argument in turn.

### A. *Weighing of the medical opinion evidence*

Watkins argues that the ALJ failed to properly weigh the medical opinion evidence of Dr. Carroll and Dr. Cohen. Specifically, he asserts that the ALJ erred in failing to give Dr. Carroll's opinions controlling weight as his treating physician and in only giving partial weight to Dr. Cohen's opinion. We disagree.

To obtain social security disability benefits, the applicant must prove he is disabled. *See Barnhart v. Thomas*, 540 U.S. 20, 21 (2003). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [the person] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

When making the disability assessment, the ALJ must give special attention to the medical opinions, particularly those of the treating physician. SSA regulations in force at the time Watkins filed his application required an ALJ to give "controlling weight" to a treating physician's opinion if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case

record." 20 C.F.R. § 404.1527(c)(2).[13]  Good cause to discount a treating physician's opinion exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F.3d at 1179 (quotation omitted).

The Social Security regulations provide that an ALJ should consider many factors when weighing a medical opinion, including (1) the examining relationship between the physician and the applicant; (2) the treatment relationship, including the length and nature of the treatment; (3) whether the medical opinion is supported by the relevant evidence; (4) whether the opinion is consistent with the record as a whole; and (5) the specialization of the physician rendering the opinion. *See* 20 C.F.R. § 404.1527(c).

"[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179.  There are no magic words to state with particularity the weight given to the medical opinions.  Rather, the ALJ must "state with at least some measure of clarity the grounds for his decision." *Id.* (quotation omitted).

Importantly, "[a]n administrative law judge is not required to agree with the statement of a medical source that a claimant is

---

[13] In 2017, the SSA amended its regulations and removed the "controlling weight" requirement for all applications filed after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c.  Because Watkins filed his DIB application in 2012, the former regulations apply.

'disabled' or 'unable to work.'" *Walker*, 987 F.3d at 1338 (quoting 20 C.F.R. § 404.1527(d)(1)). Rather, whether a claimant is disabled within the meaning of the statute is a question reserved for the ALJ acting on behalf of the Commissioner of Social Security. *Id.* at 1338–39.

### i.    Dr. Carroll's Opinions

Here, the ALJ articulated a specific justification for giving Dr. Carroll's opinions less than controlling weight—her opinions were not consistent with her own treatment notes or the other medical evidence in the record. For instance, Dr. Carroll noted in her narrative statements[14] and the medical questionnaires that Watkins suffered from suicidal thoughts—and, on at least one evaluation, Dr. Carroll also documented a history of suicide attempts—and agitated psychomotor function, but her treatment notes did not support these assessments. Rather, on each of Watkins's visits, Dr. Carroll marked that Watkins did not suffer from suicidal ideation and he had no history of suicide attempts, and she also documented that he had either unremarkable psychomotor function or retardation of psychomotor function (not

---

[14] The Commissioner argues that Dr. Carroll's narrative statements in 2012 and 2014 that summarize Watkins's treatment history and his subjective reports of symptoms and limitations are not "medical opinions" within the meaning of the Social Security regulations and therefore are not entitled to any special weight. Because the ALJ treated Dr. Carroll's narrative statements as medical opinions, however, we do so as well. In considering these statements, we express no opinion on whether or not such narrative statements qualify as medical opinions for purposes of the regulations.

agitated).  The other medical evidence in the record from other treating physicians also reflect findings of no suicidal ideation[15] or attempts and unremarkable psychomotor function or retardation of psychomotor function.[16]  Thus, her assessments to the contrary in her medical opinions and source statements were not supported by the record.

Furthermore, while Dr. Carroll opined that Watkins's symptoms moderately to markedly limited his ability to maintain socially appropriate behavior and adhere to basic standards of neatness, her treatment notes (as well as the notes from other providers) routinely reflected that Watkins had an appropriate appearance, maintained good eye contact, and was cooperative

---

[15] In his brief on appeal, Watkins points to one instance of suicidal ideation in the VA records from September 2015, which he contends supports Dr. Carroll's statements regarding suicidal ideation.  Specifically, in September 2015, the VA noted that Watkins reported that in June 2015, he thought about "driving [his] motorcycle out to the desert and letting [himself] starve to death. Denies any current intentions or plans."  The problem for Watkins is that Dr. Carroll completed the respective narrative statements and questionnaires noting suicidal ideation prior to June 2015.  And Watkins does not allege any other instances of suicidal ideation nor point to any instances in the record prior to June 2015 in which he reported such thoughts to Dr. Carroll or anyone else.  Thus, the record does not support Dr. Carroll's statements.

[16] Watkins asserts that the record supports findings of psychomotor abnormalities, which supports Dr. Carroll's statements.  The problem for Watkins is that the records Watkins cites document retardation of psychomotor function (and in one instance "restless" psychomotor function), not agitation.  Moreover, Dr. Carroll also documented unremarkable psychomotor function a majority of the time.  Thus, Dr. Carroll's statements otherwise are not supported by the record.

and able to communicate and interact appropriately with doctors and staff. Similarly, while Dr. Carroll opined that Watkins had impaired memory function, her treatment notes routinely indicated that Watkins had organized and logical thought processes. Additionally, other providers documented no issues with Watkins's short- or long-term memory.

The ALJ also explained that Dr. Carroll's narrative statements were due less weight because they "appeared to be based on the claimant's subjective self-reports and not based on her own observations" or objective medical evidence. The ALJ's assessment is supported by the record and constitutes good cause for giving Dr. Carroll's opinions less weight.[17] *See Crawford*, 363 F.3d at 1159 (affirming ALJ's discounting of treating physician's opinion where it was "based primarily on [the applicant's] subjective complaints of pain").

Accordingly, the ALJ's stated reason for giving Dr. Carroll's medical opinions less than controlling weight—because her opinions were inconsistent with her treatment notes and the

---

[17] For instance, in the September 2012 statement—after having treated Watkins only twice—Dr. Carroll stated that "[Watkins] sees his employment as a large source of his stress"; "[h]e continues to have times where it is difficult to get out of bed, bathe, perform ADLs and function outside of his home"; "[h]e has encountered considerable social and family strain due to his symptoms"; and "[h]e feels incapable of returning to the work place." These statements were clearly based on Watkins's subjective self-reporting and were not supported by Dr. Carroll's treatment notes from her two visits with Watkins.

record as a whole—was adequate, is supported by the record, and amounts to good cause. *Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1275 (11th Cir. 2024); *Winschel*, 631 F.3d at 1179.

Watkins resists this conclusion by arguing that the ALJ fundamentally misunderstood mental disorders, which are known to cause fluctuating symptoms, and "cherry-pick[ed]" normal findings from the record to support his determination that Watkins was not disabled. We disagree. Although the ALJ may not have referred to every piece of evidence in his decision, it is clear that the ALJ did much more than "cherry-pick[]" favorable evidence in the record to support his decision. Rather, the ALJ's opinion contained a detailed, lengthy discussion of the evidentiary record and demonstrated that he clearly considered all of the evidence submitted and Watkins's condition as a whole, which is all that is required. *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" but must include enough "to enable [the district court or this Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole" (first and second alteration in original)); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (rejecting an accusation of "cherry picking" by the ALJ and explaining that "the same process can be described more neutrally as weighing the evidence").

Watkins also points out that Dr. Carroll's treatment notes supported many of her other findings—that Watkins had decreased

memory; weight change; sleep issues; depressed or anxious mood; loss of interest; feelings of guilt/worthlessness; social withdrawal/isolation; constricted affect; difficulty concentrating; decreased energy; and abnormalities of psychomotor function— which he argues demonstrates that her opinions were consistent with the overall record and should have been given controlling weight.[18] However, the ALJ was entitled to find that the inconsistencies discussed previously rendered Dr. Carroll's opinions deserving of less weight, despite the consistency of some of her other findings in the record. Furthermore, even if the evidence Watkins cites could support his position, we cannot reweigh or reevaluate the evidence or otherwise substitute our judgment for that of the agency. *Winschel*, 631 F.3d at 1178; *see also Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1320 (11th Cir.

---

[18] Watkins argues that all of the relevant factors in 20 C.F.R. § 404.1527(c) that an ALJ is supposed to consider in weighing medical opinion evidence— namely, (1) the examining relationship between the physician and the applicant; (2) the treatment relationship, including the length and nature of the treatment; (3) whether the medical opinion is supported by the relevant evidence; (4) whether the opinion is consistent with the record as a whole; and (5) the specialization of the physician rendering the opinion—weigh in favor of crediting Dr. Carroll's opinions. We disagree. Although the nature and length of their treatment relationship and Dr. Carroll's specialization may have weighed in favor of crediting her opinions, the ALJ explained that Dr. Carroll's opinions were inconsistent with her own findings from mental status exams during Watkins's visits as well as the records from the VA providers who were treating Watkins during the same time period. These inconsistencies weighed against crediting Dr. Carroll's opinions. Regardless, nothing in the regulations requires the ALJ to explicitly discuss each of the factors in his decision. *See generally* 20 C.F.R. § 416.927.

2021) ("We will affirm the Commissioner's decision if it is supported by substantial evidence, even if the preponderance of the evidence weighs against it.").    Rather, as we explained previously, "[o]ur review of the Commissioner's decision is limited to whether substantial evidence supports the decision and whether the correct legal standards were applied." *Walker*, 987 F.3d at 1338. In other words, for purposes of this claim, we are limited to reviewing whether the ALJ articulated a specific justification for giving Dr. Carroll's opinions less than controlling weight and determining whether that justification constituted good cause. When, as here, those requirements are met, "[w]e will not second guess the ALJ about the weight the treating physician's opinion deserves." *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 823 (11th Cir. 2015).

### ii.    Dr. Cohen's Opinion

The ALJ articulated a specific justification for giving Dr. Cohen's opinion only "partial weight"—Dr. Cohen evaluated Watkins on only one occasion and his opinion concerning the severity of Watkins's symptoms and the resulting limitations from said symptoms was not consistent with the treatment notes from the evaluation.[19]  For instance, as the ALJ pointed out, other than finding that Watkins had a depressed mood with a congruent affect, marked by tearfulness, Dr. Cohen otherwise found that

---

[19] Unlike treating physicians, the opinions of non-treating physicians, such as doctors who examine a claimant only once, are "not entitled to great weight." *Crawford*, 363 F.3d at 1160.

Watkins's mental status was essentially normal during the evaluation. Watkins was punctual to his appointment, he drove himself, he was well-groomed, he made good eye contact, and he behaved appropriately. Watkins's speech was also normal and his thought process was goal-directed. He also exhibited an average attention span and concentration with the tests administered. Dr. Cohen observed that Watkins's memory was below average, but not impaired. He also noted that Watkins denied suicidal ideation. Yet, Dr. Cohen indicated more severe symptoms in his medical opinion, indicating that Watkins exhibited symptoms of suicidal ideation, retardation of psychomotor function, and difficulty thinking or concentrating. As the ALJ explained, these findings were not supported by Dr. Cohen's treatment notes from the one-time evaluation or the treatment notes from the numerous providers at the VA.[20] Therefore, the ALJ provided good cause for

---

[20] The ALJ also noted that Dr. Cohen's statement that Watkins had "bouts of depression that last[ed] for several weeks" was unsupported because he was a non-treating physician who only met with Watkins one time (and therefore this statement was clearly based on Watkins's subjective complaints and not Dr. Cohen's objective medical observations). Watkins points to this finding and argues that the ALJ committed reversible error because, according to Watkins, case law establishes that a medical opinion cannot be rejected simply because it is retrospective in nature as long as it is otherwise supported by objective medical evidence in the record. *See Boyd v. Heckler*, 704 F.2d 1207, 1212 (11th Cir. 1983) (holding that the fact that a physician did not examine the claimant until after the expiration of the claimant's insured status did "not render [the] medical opinion incompetent or irrelevant to the decision in this case"), *superseded by statute on other grounds*, 98 Stat. 1794 (1984). However, the ALJ did not partially reject Dr. Cohen's opinion because it was retrospective in nature—indeed, Dr. Cohen examined Watkins well before his insured

giving Dr. Cohen's opinion only partial weight, and we will not second guess that judgment.[21] *Winschel*, 631 F.3d at 1179; *Hunter*, 808 F.3d at 823.

### B.  *Weighing of Watkins's Subjective Statements*

Watkins argues that the ALJ failed to apply the correct legal standards in evaluating Watkins's subjective statements concerning his symptoms, and that the ALJ's evaluation of his symptoms was not supported by substantial evidence. We disagree.

A claimant's subjective complaints standing alone are insufficient to establish a disability, but such statements are considered as part of the overall disability determination. 20 C.F.R. § 404.1529(a) (explaining that the agency considers the claimant's

---

status expired and offered an opinion about Watkins's current disabled state. Rather, the ALJ partially rejected Dr. Cohen's opinion because it was not supported by the objective medical evidence in Dr. Cohen's treatment notes and the record as a whole.

[21] Watkins asserts that meaningful review of his claim is precluded because it is impossible to tell from the record which portions of Dr. Cohen's report the ALJ rejected, and which portions he credited. His argument is unpersuasive. To enable us to conduct a meaningful review, an ALJ must "state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered." *Ryan v. Heckler*, 762 F.2d 939, 941 (11th Cir. 1985). The ALJ did exactly that here. He explained the legal rules he applied and the weight he gave Dr. Cohen's opinion. He also explained in detail the portions of the opinion that he found not supported by, or otherwise inconsistent with, the objective medical evidence. Accordingly, the ALJ's explanation was sufficient to enable meaningful review.

subjective statements about symptoms in making the disability determination, but "statements about [the claimant's] pain or other symptoms will not alone establish that [he is] disabled"). Specifically, in determining the extent to which the claimant's symptoms affect his capacity to work, the ALJ will consider the claimant's subjective statements "about the intensity, persistence, and limiting effects of [his] symptoms" and evaluate the "statements in relation to the objective medical evidence and other evidence." *Id.* § 404.1529(c)(4). In doing so, the ALJ

> will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [the claimant's] history, the signs and laboratory findings, and statements by . . . medical sources or other persons about how [the claimant's] symptoms affect [the claimant].

*Id.* When evaluating the extent to which a claimant's symptoms affect his capacity to perform basic work activities, the ALJ considers the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication taken to alleviate symptoms; treatment other than medication; any measures used to relieve symptoms; other factors concerning functional limitations and restrictions due to symptoms; and inconsistencies between the evidence and subjective statements. *Id.* § 404.1529(c)(3), (4).

After considering a claimant's subjective complaints, the ALJ may reject them as not credible, which will be reviewed for substantial evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). The ALJ must explicitly and adequately articulate his reasons if he discredits subjective testimony. *Id.* "Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). On the other hand, "[a] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).

Here, the ALJ set forth the applicable legal standards for evaluating subjective testimony and then applied those standards to Watkins's subjective complaints. The ALJ explained that Watkins alleged that his symptoms caused him "problems with concentration, focus, and memory, sleeping problems, isolation, crying spells, and worries. He also reported having fear, depression, problems with personal care, and needing reminders." The ALJ found that Watkins's mental impairments could be reasonably expected to cause the alleged symptoms, but that Watkins's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." Accordingly, the ALJ concluded that Watkins's "allegations of a total inability to work are overstated and unsupported by the medical evidence of record as a whole."

Substantial evidence supports the ALJ's decision. Watkins subjectively reported a total inability to work due to his symptoms and significant limitations in multiple areas of functioning. As the ALJ noted, however, while Dr. Carroll, Dr. Cohen, and the VA practitioners noted a depressed mood and constricted affect, Watkins was otherwise generally alert, well-groomed, exhibited fair eye contact, spoke clearly and coherently, and exhibited logical and organized thought processes with only occasionally impaired memory. Watkins routinely attended doctor's appointments alone, was punctual and cooperative, was able to communicate effectively, and was compliant with doctor's instructions. Furthermore, Watkins did not require hospitalization for psychiatric treatment and his treatment mainly consisted of medication management and counseling. Moreover, the ALJ noted that Watkins exhibited a cooperative and responsive demeanor at the second hearing. Specifically, the ALJ noted that, during the hearing,

> [Watkins] was alert and aware of what went on at the hearing, and he paid good attention, was well focused, understood the questions and gave relevant and very detailed answers. His manner of relating, social skills and overall presentation seemed adequate; his speech was clear, intelligible, goal directed, logical, coherent, and he kept his trend of thought.

Thus, based on the objective medical evidence and other evidence in the record, the ALJ concluded that Watkins's "alleged symptoms

and restrictions [were] exaggerated."[22]    Accordingly, the ALJ articulated sufficient, adequate reasons for discounting Watkins's subjective complaints, and these reasons were supported by substantial evidence.

Watkins argues that the ALJ improperly rejected his subjective complaints in violation of the social security regulations solely because the objective medical evidence did not substantiate his statements. *See* 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").    This contention is belied by the record. The ALJ's decision reflects that he considered, in addition to the objective medical evidence, the specifics of Watkins's testimony at the hearing, Watkins's statements concerning his daily activities and abilities, and the opinions of Watkins's doctors. The ALJ then properly evaluated Watkins's subjective statements in relation to the evidence in the record and found that Watkins's subjective complaints were exaggerated and inconsistent with the evidence of record. *Id.* § 404.1529(c)(4).

---

[22] Watkins asserts that "the ALJ erred in suggesting that mental status findings cannot support a finding of disability for Plaintiff." But the ALJ made no such suggestion.    Rather, as discussed above, the ALJ merely concluded that Watkins's subjective complaints concerning his symptoms and the resulting limitations of said symptoms on his ability to work were exaggerated and not supported by the record as a whole.

Next, Watkins argues that the ALJ erred in considering his treatment records and his purported improvement with said treatments because psychiatric symptoms are known to "wax and wane," and there was no evidence that Watkins had improved enough that he would be able to sustain work. Watkins's argument is unpersuasive. We have held that "[t]he ALJ may consider the level or frequency of treatment when evaluating the severity of a claimant's condition," which is what the ALJ did here. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015); *see also Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (sustaining an ALJ's finding concerning the conservative nature of the treatment for purposes of discrediting the claimant's statements concerning the severity and limitations of his disability). Accordingly, there was no error.

Finally, Watkins argues that the ALJ engaged in improper "sit and squirm" jurisprudence by relying on his observations of Watkins's appearance and demeanor at the hearing as part of the disability determination. We disagree. In *Freeman v. Schweiker*, we condemned "sit and squirm" jurisprudence where "an ALJ who is not a medical expert . . . subjectively arrive[s] at an index of traits which he expects the claimant to manifest at the hearing," and "[i]f the claimant falls short of the index, the claim is denied." 681 F.2d 727, 731 (11th Cir. 1982). However, post-*Freeman*, we clarified that *Freeman* stands only for the proposition that "an ALJ must not impose his observations in lieu of a consideration of the medical evidence presented." *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985). We further explained that the ALJ is permitted to

observe and consider the claimant's demeanor and appearance as part of the credibility determination. *Id.* Unlike "sit and squirm" jurisprudence, the ALJ here did not ignore medical evidence and impose his own subjective standards; rather, he appropriately considered Watkins's demeanor and appearance at the hearing as one of many factors in assessing Watkins's credibility. Thus, there was no error.

In sum, the evaluation of Watkins's subjective symptoms and credibility belonged to the ALJ, and the ALJ supported that finding with substantial evidence. Accordingly, we will not disturb that finding. *Foote*, 67 F.3d at 1562.

### C.  The RFC Determination

Watkins argues that the ALJ failed to properly determine his mental RFC under Social Security Rule ("SSR") 96-8p. The gravamen of his argument is that the RFC assessment is not supported by substantial evidence because there was no medical opinion evidence supporting the RFC determination or demonstrating that Watkins could perform full-time work on a sustained basis. We disagree.

A claimant's RFC represents the most that an individual can do despite his limitations or restrictions. *See* 20 C.F.R. § 404.1545(a)(1). Under SSR 96-8p, the "RFC assessment must first identify the [claimant's] functional limitations or restrictions and assess his . . . work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and

very heavy." SSR 96-8p, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996). The rule further provides that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Id*. at 34478.

There is no requirement in SSR 96-8p that there be medical opinion evidence from a physician that matches the RFC determination. Rather, the regulations make clear that the task of determining a claimant's RFC and ability to work is solely within the province of the ALJ, not the claimant's doctors. *See* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity."); *see also id*. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity (*see* §§ 404.1545 and 404.1546), . . . the final responsibility for deciding these issues is reserved to the Commissioner."). And the ALJ is directed to assess the claimant's RFC "based on all the relevant evidence in [the] record." *Id*. § 404.1545(a)(1); *see also* SSR 96-8p, 61 Fed. Reg. at 34,477 (providing that the RFC determination "must be based on all of the relevant evidence in the case record," including, as relevant here, the claimant's medical history; medical source statements; "[t]he effects of treatment"; "[r]eports of daily activities"; "[l]ay evidence"; "[r]ecorded observations"; and "[e]ffects of symptoms").

Watkins nevertheless argues that "the absence of any [medical] opinion support for the RFC determination is concerning [when, as here,] there is no other specific medical or non-medical basis for the ALJ's decision." In support, he argues that his case is similar to that in *Pupo v. Commissioner, Social Security Administration*, 17 F.4th 1054 (11th Cir. 2021). In *Pupo*, we held that the RFC determination that the claimant could perform medium level work—which required frequent lifting and carrying of objections weighing up to 25 pounds—was not supported by substantial evidence because the ALJ failed to consider the claimant's significant urinary incontinence and the effect of that impairment on her physical abilities when making the RFC determination. *Id.* at 1064–65. We also noted that because the ALJ only assigned "minimal weight" to the treating physician's opinion about Pupo's physical abilities and limitations, and the record did not contain any opinion about the effect of Pupo's incontinence on her physical abilities and limitations, the ALJ was left "without any medical opinion on that issue at all." *Id.* at 1064–65. We noted that while medical opinion is not always necessary, in Pupo's case, the absence of such evidence was

> particularly concerning . . . because the ALJ also failed to conduct a function-by-function assessment of Pupo's physical abilities and to explain how the non-opinion evidence in the record—both medical and nonmedical—supported his finding that Pupo could perform all the physical requirements for medium work, including lifting as much as fifty pounds at a time and frequently lifting up to twenty-five pounds.

*Id.* at 1065.

Watkins's case is distinguishable from *Pupo*. Here, unlike in *Pupo*, the ALJ's decision makes clear that he considered all of Watkins's impairments, as well as Watkins's medical records from Palm Partners, LLC, Dr. Carroll, Dr. Cohen, and the VA, Watkins's subjective statements, and the ALJ's own observation of Watkins at the hearing. The ALJ also explained how he resolved discrepancies in Dr. Carroll's and Dr. Cohen's medical opinions, as well as between Watkins's subjective complaints and the record as a whole. The ALJ then found that the evidence did not support the level of disability that Watkins claimed as a result of his stated impairments, and that Watkins had the RFC to perform simple work of a medium exertional level. Thus, the ALJ complied with SSR 96-8p by first considering Watkins's functional limitations and restrictions and then expressing Watkins's residual functional limitations in terms of exertional and non-exertional levels. Moreover, the ALJ's conclusion that Watkins retained the mental RFC to perform "simple, routine, repetitive unskilled tasks" involving only simple decisions with limited workplace changes and only occasional interaction with coworkers, supervisors, and the public, is supported by substantial evidence. For instance, the record demonstrated that Watkins was able to follow his various doctors' instructions, perform routine tasks, and was able to adequately communicate with a variety of healthcare professionals while interacting appropriately. He was also able to complete the cognitive tests administered by Dr. Cohen. This evidence is just some of the evidence in the voluminous records that supports the

ALJ's mental RFC finding.  In sum, we conclude that the ALJ adequately analyzed and described Watkins's RFC, and Watkins is not entitled to relief on this claim.

## IV.    Conclusion

For the above reasons, we affirm.

**AFFIRMED.**