[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-14633

_____

MARIA TERESA PUPO,

Plaintiff-Appellant,

*versus*

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:17-cv-23609-JB

_____

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

WILSON, Circuit Judge:

Maria Teresa Pupo appeals the district court's order affirming the Commissioner of the Social Security Administration's (Commissioner) denial of her application for supplemental security income (SSI).  Pupo raises five issues on appeal: (1) the administrative law judge (ALJ) erred by not considering whether to apply a higher age category, (2) the Appeals Council erred by not considering additional medical evidence she submitted, (3) the ALJ erred in assessing her residual functional capacity (RFC), (4) the ALJ erred in not giving controlling weight to her treating doctor and psychiatrist, and (5) the ALJ erred in finding her mental impairments did not meet a listed impairment.  We find that the Commissioner's decision is not supported by substantial evidence for two reasons.  First, the ALJ erred by not addressing one of Pupo's medical diagnoses, her incontinence, when assessing her RFC.  Second, the Appeals Council erred by not considering the new medical evidence submitted by Pupo following the ALJ's denial of her SSI claim.  Accordingly, we reverse the district court's decision affirming the ALJ's decision and remand to the Commissioner to reevaluate Pupo's claim consistent with this opinion.

BACKGROUND

Before turning to the facts of the case, here is a brief overview of the process for obtaining social security benefits.  The claimant applies in writing to the Social Security Administration

(SSA) and if the SSA denies the application, the claimant has sixty days to seek reconsideration. *See* 42 U.S.C. § 405(b)(1). If the SSA denies reconsideration, the claimant can request a hearing before an ALJ.

At the hearing, the ALJ performs a five-step analysis in determining if the applicant is disabled. The steps are as follows:

1. At Step One, the ALJ determines whether the claimant is engaged in substantial gainful activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

2. At Step Two, the ALJ determines whether the claimant has a severe impairment. A claimant who does not have a severe impairment is not disabled. *Id.* § 416.920(a)(4)(ii).

3. At Step Three, the ALJ determines whether the claimant has an impairment that meets or equals a listed impairment. A claimant who meets or equals a listed impairment is disabled. *Id.* § 416.920(a)(4)(iii).

4. At Step Four, the ALJ determines whether the claimant has any impairments that prevent her from returning to her past relevant work. If the claimant has a severe impairment that does not equal or meet the severity of the listed impairment, the ALJ proceeds to Step Four and assesses the claimant's RFC. If the claimant can return to her past or relevant work, then she is not disabled. *Id.* § 416.920(a)(4)(iv).

5.  At Step Five, the ALJ determines whether the claimant's im-
    pairment prevents her from doing any other work.  If the
    claimant can adjust to other work, she is not disabled, but if
    she cannot adjust, she is disabled.  *Id.* § 416.920(a)(4)(v).

The claimant may also obtain judicial review of the ALJ's
decision in a United States district court by commencing a civil ac-
tion within sixty days of notice of the decision.  42 U.S.C. § 405(g).

Pupo first applied for SSI in June 2011, alleging that she was
unable to work due to depression, body tremors, and high blood
pressure.  Her initial application was denied, but, in June 2015, her
case was remanded by the district court for further proceedings
pursuant to sentence four of 42 U.S.C. § 405(g).  The Appeals Coun-
cil then vacated the Commissioner's final decision and remanded
the case to an ALJ for the resolution of certain issues.  The ALJ is-
sued a decision in August 2016, which is the subject of this appeal.

### I. Pupo's Medical Evidence

Pupo submitted medical and opinion evidence that reflects
numerous ailments over the years.  In 2009, she was struck by a
vehicle and doctors treated her for a broken clavicle and minor in-
juries to other parts of her body.  From 2011 to 2014, she visited
Dr. Omar Suarez routinely for physical exams with complaints of
headaches, episodes of weakness and fatigue, back pain, depres-
sion, and left foot pain.

In July 2014, she began seeing Dr. Rolando E. Diaz, who,
after treating Pupo for a year and a half, completed a physical RFC

questionnaire for Pupo, listing the following diagnoses: low back pain, uterine prolapse, gastroesophageal reflux disease (GERD), urinary incontinence, hypothyroidism, obesity, hyperlipidemia, and diabetes mellitus type II. Pupo had never been hospitalized for her medical impairments. She had several secondary side effects from her medicines, including nausea and dizziness, but she had responded to treatment as well as expected and no courses of treatment had been discontinued because of side effects or ineffectiveness. Her symptoms included fatigue, dizziness, and pain in her low back, left clavicle, and left body side. This pain often interfered with her attention and concentration. Despite these symptoms, Dr. Diaz had not placed or requested any limitations on her activity in the RFC questionnaire.

When estimating Pupo's functional limitations in a competitive work situation, Dr. Diaz stated that Pupo could not walk far without rest or experiencing severe pain and she could sit or stand for forty-five minutes at one time before needing to change positions or walk around. Due to body pain, Pupo could rarely lift ten pounds in a competitive work situation, but could use her hands for simple grasping, pushing and pulling, and fine manipulation and could use her feet for repetitive movements. Dr. Diaz noted that Pupo's impairments were not likely to produce "good days" or "bad days" because her impairments consistently limited her functional capacity on a day-to-day basis.

From March 2011 to April 2016, Pupo visited several urologists and gynecologists with complaints of urinary incontinence.

During these visits Pupo complained that she had to wear five pads a day, her doctors noted that she had a prolapsed bladder, and her symptoms were not responding well to medication.

In addition to records on her physical impairments, Pupo also submitted records about her psychological impairments. In 2011, Pupo was diagnosed with major depressive disorder after completing a psychiatric evaluation. From May 2011 to February 2014, she visited a psychiatrist, Dr. Rosa Amurrio, regularly for treatment. Dr. Amurrio prescribed Pupo a variety of medications for her mental disorders. Pupo was briefly committed to inpatient treatment for one week after she told Dr. Amurrio that she had hallucinations and suicidal ideation. However, she later denied having had these symptoms after being discharged. During her regular visits, Dr. Amurrio reported that Pupo was casually dressed, had good eye contact and fluent speech, and was oriented. Her mood had improved slightly, but she still experienced forgetfulness, lack of energy, and anxiety. Pupo had complained of anxiety and depression after running out of her medications but reported that she had an improved mood and was doing much better while taking medications.

In July 2012, Dr. Amurrio completed a psychiatric and psychosocial evaluation of Pupo. She diagnosed Pupo with major depressive disorder and severe and generalized anxiety disorder. Dr. Amurrio had not placed or requested any limitations on Pupo's activities. Her impairments were likely to produce good and bad days because her decreased mood could cause bad days. She

suffered from depressive syndrome with the following clinical features: anhedonia; appetite disturbance with change in weight; difficulty concentrating or difficulty thinking; hallucinations, delusions, or paranoid thinking, and feelings of guilt or worthlessness. Pupo's condition did not result in a complete inability to function independently outside of her home.

Next, Dr. Amurrio reported that Pupo had the following restrictions for work-related mental activities: mild restrictions in carrying out short, simple instructions; moderate restrictions in understanding and remembering detailed instructions; moderate restrictions in carrying out detailed instructions; and mild restrictions in the ability to make judgments on simple work-related decisions. Pupo also had mild restrictions for interacting appropriately with coworkers and marked restrictions for responding appropriately to work pressures and changes in a usual work setting.

## II. The ALJ Hearing and Decision

Pupo had an ALJ hearing in April 2016. She testified that she was 54-years old and born in Cuba. She could not communicate in English, and could not work due to depression, pain in her left clavicle and left leg, diabetes, high blood pressure, and urinary incontinence. Her only work experience was a six-month stint in 2007–08 cleaning construction homes. She testified that she could stand or walk for forty-five minutes to an hour, could sit for about an hour before feeling increased pain, and could lift twenty pounds without feeling an increase in pain. She did not do any housework, had difficulty dressing herself because of her left arm pain, occasionally

went grocery shopping with her husband, read the Bible for ten minutes per day, and needed her husband to remind her to take her medications.  A vocational expert (VE) also testified about hypothetical individuals with Pupo's age, education, and past work experience who could perform work at the medium exertional level and found that there were three jobs that she could do: industrial cleaner, laundry worker, and hand packager.

The ALJ issued a decision in August 2016 which concluded that Pupo was not disabled. The ALJ made the following findings:

- At Step One of the sequential analysis, Pupo had not engaged in substantial gainful activity since her application for benefits.

- At Step Two, Pupo had numerous severe impairments: major depressive disorder, hypertension, hypothyroidism, diabetes type II, and obesity.

- At Step Three, Pupo did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (a Listing) in 20 C.F.R Part 404, Subpart P, Appendix 1.

- Pupo had the RFC to perform medium work except that she was limited to work that requires her to remember and implement simple instructions, have occasional contact with coworkers, and no contact with the general public.  In making this determination, the ALJ noted that "the claimant's statements    concerning    the    intensity,    persistence    and

limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record."

- At Step Four, Pupo had no past relevant work.

- At Step Five, there were jobs that existed in significant numbers in the national economy that Pupo could perform, considering her age, education, work experience, and RFC.

- Accordingly, the ALJ found that Pupo was "not disabled."

Notably, the ALJ did not identify Pupo's stress urinary incontinence as one of her severe impairments at Step Two and did not address the effect of her stress urinary incontinence on her physical abilities at Step Four. The ALJ's Step Four finding that Pupo had the RFC to perform "medium work" meant that she could, among other things, lift up to fifty pounds at a time and could frequently lift and carry up to twenty-five pounds. *See* 20 C.F.R. § 416.967(d). In making this RFC assessment, the ALJ "assign[ed] minimal weight" to the opinion of Dr. Diaz, Pupo's treating physician, in his RFC questionnaire. The ALJ explained that objective medical evidence, including Dr. Diaz's own "relatively unremarkable" physical exams, did not support Dr. Diaz's RFC opinion.

In October 2016, Pupo filed with the Appeals Council written exceptions to the ALJ's decision. She also submitted additional evidence including her treatment records between May 2016 and September 2016. The Appeals Council declined to assume

10                    Opinion of the Court                    19-14633

jurisdiction and found that the new evidence would not change the outcome. Specifically, it stated "[w]e did not consider or exhibit this evidence."[1]

Pupo then filed a complaint in the district court requesting review of the ALJ's denial of benefits. The district court granted the Commissioner's motion for summary judgment, denied Pupo's motion for summary judgment, and affirmed the ALJ's decision. Pupo appealed to this court.

STANDARD OF REVIEW

We review de novo the legal principles applied by the Commissioner in social security appeals. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam). However, we review the resulting decision only to determine if it is supported by substantial

---

[1] Ordinarily, a claimant appealing an ALJ's decision files a request for review with the Appeals Council. 20 C.F.R. §§ 416.1467, 416.1468. When, as here, the claimant appeals an ALJ's new decision after a district court remand, the claimant instead files "written exceptions" to the ALJ's new decision. 20 C.F.R. § 416.1484(a); *see also* SSA, Hearings, Appeals, and Litigation Law Manual (HALLEX) I-4-8-5A (2020) (explaining that when there is a district court remand, the claimant files written exceptions rather than a request for review).

The Appeals Council "may assume jurisdiction" based on the claimant's written exceptions and applies the same "standard set forth in § 416.1470" applicable to requests for review. 20 C.F.R. § 416.1484(a). The Appeals Council also considers any additional evidence from the claimant "using the same procedures as in request for review cases." HALLEX I-4-8-25C. If the Appeals Council declines to assume jurisdiction, it "issue[s] a notice to [the claimant] addressing [the claimant's exceptions] and explaining why no change in the [ALJ's] hearing decision is warranted," and the ALJ's new decision becomes the final decision of the Commissioner. 20 C.F.R. § 416.1484(b)(2).

evidence.  *Id.*  "Substantial evidence is less than a preponderance" and "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.*  The individual seeking social security disability benefits bears the burden of proving that she is disabled.  *Id.*  We will not decide the facts anew, make credibility determinations, or re-weigh the evidence.  *Id.*

DISCUSSION

*I. Whether the ALJ Erred by Failing to Consider Using the Older Age Category in Assessing Pupo's Ability to Adapt to Other Work.*

Pupo's first issue on appeal involves Step Five of the ALJ's analysis.  After there has been a finding at Step Four that the claimant cannot return to her past relevant work,[2] the burden shifts to the agency to show that a significant number of jobs exist in the national economy that the claimant could perform.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011).  There are two paths that the ALJ may take to make this determination. First, the ALJ can turn to the Medical-Vocational Guidelines, referred to as the grids, which will direct a finding of "disabled" or "not disabled."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.  Second, if

---

[2] In this case, the ALJ found at Step Four that Pupo had no past relevant work, which means, in effect, she cannot return to any past relevant work.  *See* 20 C.F.R. § 416.960(b) (defining "past relevant work" as work the claimant had "done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it").

12                    Opinion of the Court                    19-14633

the grids do not apply because a claimant does not meet all the criteria, then the grids should be used as a framework along with independent evidence. *Id.* § 200.00(d).

The grids are comprised of a series of tables, referred to as rules, with each table corresponding to a different RFC (sedentary, light, medium). The regulations provide that "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." *Id.* § 200.00(a). The vocational factors considered include the claimant's age, education, and work experience. Under the regulations, "age" means a claimant's "chronological age." 20 C.F.R. § 416.963(a). A person aged 50 to 54 is classified as "closely approaching advanced age," and a person aged 55 or older is classified as "advanced age." *Id.* § 416.963(d)–(e).

In a sense, the grids function like an equation, where the ALJ inputs the various factors, and an outcome is generated. *See Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985) (per curiam) (describing the grids as "a series of matrices which correlate a set of variables" to render a finding of disabled or not disabled). While this method is clean and efficient, every claimant is unique and sometimes the criteria in the grids do not accurately reflect the true capabilities of a particular claimant. *See id.* To ensure that the ALJ does not rely too heavily on the grids, we have proscribed the mechanical application of the grids based on the claimant's age in

determining whether the claimant can adapt to other work. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (per curiam). While the ALJ may use the claimant's age in applying the grids, it will not be conclusive. *Reeves v. Heckler*, 734 F.2d 519, 525 (11th Cir. 1984) (per curiam). Before the ALJ relies on the age factor of the grids in making his determination, the claimant should first be allowed to proffer "substantial credible evidence that his ability to adapt is less than the level established under the grids for persons his age." *Id.*

Relevant to this case, the grids "may not be used when the claimant's non-exertional impairments are severe enough to preclude a wide range of employment at the level indicated by the exertional impairments." *Walker*, 826 F.2d at 1003 (emphasis omitted). Examples of non-exertional impairments are nervousness or anxiety, difficulty concentrating, or difficulty remembering detailed instructions. 20 C.F.R. § 416.969a(c). The grids may still be used as a framework in this situation, but the ALJ will need to provide independent evidence, preferably through VE testimony, to assess the impact these limitations have on the claimant's ability to adapt to other work in the national economy. *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam). For the VE's testimony to meet the substantial evidence standard, "the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Id.*

Pupo argues that the ALJ erred at Step Five because he did not consider whether the older age category should apply to Pupo.

The Commissioner responds that the ALJ did not err for two reasons: (1) Pupo did not offer any evidence that the older age category should apply and (2) the ALJ did not mechanically apply the age categories because he relied on VE testimony and only used the grids as a framework. On the day the ALJ issued his decision, Pupo was 66 days shy of her 55th birthday, which would have placed her in the "advanced age" category. Thus, Pupo contends that this case involves a borderline age situation.

We have yet to address the borderline age situation in a published opinion. The relevant regulation provides that the Commissioner:

> will not apply the age categories mechanically in a borderline situation. If [the claimant is] within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled, [the Commissioner] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case.

20 C.F.R. § 416.963(b).

At the outset, we reject the Commissioner's argument that Pupo was required to offer additional evidence that the older age category should apply in a borderline age situation. The Commissioner cites to our rule in *Reeves* in support of its argument.

However, *Reeves* is distinguishable because it did not concern a borderline age situation. There, the claimant was 37 and the next higher age category began at 50. *Reeves*, 734 F.2d at 525. Furthermore, we held there that the burden is on the claimant to show that the grids should not be applied mechanically based on the claimant's age. *Id.* In contrast, § 416.963(b) does not place the burden on the claimant, but rather says the Commissioner "*will* consider whether to use the older age category after evaluating the overall impact of all the factors." 20 C.F.R. § 416.963(b) (emphasis added). Thus, not only are the facts in *Reeves* not directly on point here but applying it in borderline age situations would be inconsistent with the language of the regulation.

Nevertheless, we agree with the Commissioner that the ALJ did not err in this case because he did not rely solely on the grids in making his disability determination. The whole crux of the borderline age regulation is that the Commissioner will not apply the age categories, i.e., the grids, mechanically. We agree that the ALJ could not have erred in failing to consider the borderline age situation because he did not apply the grids mechanically in this case, but instead relied on VE testimony due to Pupo's non-exertional limitations.

This is consistent with other circuits that have considered the borderline age situation. For example, the Tenth Circuit in *Daniels* interpreted the borderline age regulation to mean that the Commissioner may not apply the age categories mechanically "in relying on the *grids* to determine whether a claimant is disabled."

*Daniels v. Apfel*, 154 F.3d 1129, 1136 (10th Cir. 1998) (emphasis added); *see also Kane v. Heckler*, 776 F.2d 1130, 1134 (3d Cir. 1985) ("Where a procrustean application of the grids results in a case that, but for the passage of a few days, would be decided differently, such an application would appear to be inappropriate.").

In sum, we hold that the ALJ did not mechanically apply the age categories here because he did not rely on the grids, but instead used the grids as a framework along with independent evidence from VE testimony. This is consistent with the regulations and our precedent for the proper analysis at Step Five. Accordingly, the ALJ did not err by not addressing the borderline age situation and substantial evidence supports the ALJ's decision in this regard.

II. *Whether the Additional Evidence Submitted to the Appeals Council Was "New and Material" and Warrants Remand for Further Consideration by the ALJ.*

Turning to the second issue on appeal, Pupo argues that the Appeals Council erred in not considering additional medical records she submitted after the ALJ issued his decision. Generally, claimants are permitted to present new evidence at each stage of their administrative process, including before the Appeals Council. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007). The Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the

outcome of the decision." 20 C.F.R. § 416.1470(a)(5).[3] We review de novo the Appeals Council's refusal to consider new evidence. *Washington*, 806 F.3d at 1320–21. "[W]hen the Appeals Council erroneously refuses to consider evidence, it commits legal error and remand is appropriate." *Id.* at 1321.

Here, the Appeals Council erred in refusing to consider Pupo's new, material, and chronologically relevant evidence. Pupo submitted medical records showing that she had surgery because of her stress urinary incontinence nine days before the ALJ issued his decision. This new evidence showed that her stress incontinence was in fact severe and serious enough to require surgery. At the time of the ALJ's decision, the medical evidence in the record indicated that, after more conservative medication treatment for her stress incontinence had failed, Pupo's urologist and

---

[3] In 2016, 20 C.F.R. § 416.1470(a)(5) was amended, effective January 17, 2017, but with compliance not required until May 1, 2017. *See* 81 Fed. Reg. 90987, 90996 (Dec. 16, 2016). In other words, the new regulation went into effect after Pupo submitted her new evidence to the Appeals Council but before the Appeals Council issued its decision refusing to consider it. The new version of § 416.1470(a)(5) added the requirement that the new evidence show a reasonable *probability* of a different outcome before the Appeals Council will review the new evidence. Prior to this change, our precedent interpreted the term "material" in § 416.1470(a)(5) to require the new evidence to show a reasonable *possibility* of a different outcome. See *Washington v. Soc. Sec. Admin, Comm'r.*, 806 F.3d 1317, 1321 (11th Cir. 2015) (per curiam). Because the parties do not dispute that the new version of § 416.1470(a)(5) applies to Pupo's new evidence, we assume, without deciding, that it does.

gynecologists began discussing with her a possible surgical treatment. However, no surgery had ever been performed.

These new medical records showing Pupo in fact had surgery for her stress incontinence constitute new and material evidence that had a reasonable probability of changing the outcome of the decision. This is particularly true when considered with the ALJ's findings at Step Four that Pupo had never been hospitalized for any of her physical impairments and that her doctors' physical treatment notes had been "consistently unremarkable." Both of these findings now appear to be inaccurate with respect to her stress incontinence when these new records are considered.

These now-evident factual errors are compounded by the fact that, at Step Four, the ALJ did not adequately consider the effects of Pupo's stress incontinence on her ability to perform medium work, especially the lifting requirements, as discussed below. Considering this new objective medical evidence bearing on the severity of her stress incontinence, a factfinder could reasonably conclude that Pupo could not have lifted up to fifty pounds at a time or frequently lifted and carried objects weighing up to twenty-five pounds during the relevant time period. Moreover, the ALJ's hypothetical question to the vocational expert asked only about medium work with no lifting restrictions. Given the foregoing, the Appeals Council erred in concluding that this new evidence failed to show a reasonable probability of a different outcome. *See* 20 C.F.R. § 416.1470(a)(5). Because the Appeals Council failed to properly consider this new evidence submitted by Pupo, we

remand for consideration of Pupo's disability eligibility based on the total record.

III.   *Whether Substantial Evidence Supports the ALJ's Assessment of Pupo's Residual Functional Capacity (RFC).*

Pupo's third issue concerns Step Four of the sequential analysis, where the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Id.* § 416.945(a).  The ALJ makes this determination by considering the claimant's ability to lift and carry weight, sit, stand, push, pull, walk, etc., as well as the claimant's mental abilities.  *Id.* § 416.945(b)–(c).  The claimant's RFC is then used to determine her capability of performing various designated levels of work (sedentary, light, medium, heavy, or very heavy).  *See id.* § 416.967.  As noted earlier, a person with the RFC to perform medium work can lift "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," and can also perform any sedentary or light work.  *Id.* § 416.967(c).  The SSA has provided that:

> In assessing RFC, the [ALJ] must consider limitations
> and restrictions imposed by *all* of an individual's im-
> pairments, even those that are not "severe."  While a
> "not severe" impairment(s) standing alone may not
> significantly limit an individual's ability to do basic
> work activities, it may—when considered with

limitations or restrictions due to other impairments—
be critical to the outcome of a claim.

Social Security Regulation (SSR) 96-8p, 61 Fed. Reg. 34474, 34477 (July 2, 1996); *see also Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1268 (11th Cir. 2019) (per curiam) ("Consideration of all impairments, severe and non-severe, is required when assessing a claimant's RFC.").

In *Schink*, we found that the ALJ's decision was not supported by substantial evidence because the ALJ did not consider the claimant's mental impairments when evaluating the claimant's RFC, despite the ALJ stating he "considered all symptoms." *Schink*, 935 F.3d at 1269. Although the mental impairments were non-severe, the ALJ was still required to consider them when assessing the claimant's RFC. *Id.* Since the ALJ provided no assessment on the claimant's mental impairments, we found the ALJ's overall assessment of the claimant's RFC to be inadequate. *Id.* at 1270.

Similarly, here, although the ALJ stated he "considered all symptoms," his decision demonstrates that he did not. The ALJ did not consider Pupo's stress urinary incontinence when he conducted his RFC assessment. He noted that she had been treated for incontinence in his decision but did not discuss how her incontinence would impact her ability to perform work at the medium level, especially how it would affect her ability to lift and carry weight. This is particularly troubling given that the record shows that Pupo saw numerous gynecologists and a urologist about her

incontinence and uterine prolapse; she complained about incontinence to multiple providers, noting that she had to wear five pads a day; she was referred to have surgery in 2014 but was unable to receive medical clearance; she complained of incontinence when coughing or lifting weight; she had a positive cough test; and treatment through medication had failed.

Like the ALJ in *Schink*, the ALJ here was required to consider all of Pupo's impairments, severe or not, when evaluating her RFC. The ALJ did this for Pupo's other impairments, such as back pain, obesity, and depression, but failed to mention any impact that her incontinence might have had on her RFC during the relevant time period.

It is also worth noting that the ALJ did not rely on any opinion evidence from a medical doctor regarding Pupo's physical abilities, such as sitting, standing, walking, lifting, and carrying, in determining her RFC.

To be sure, an ALJ's RFC assessment is an administrative finding based on all the relevant evidence, including both medical and nonmedical evidence. *See* 20 C.F.R. § 416.945(a)(3); SSR 96-8p, 61 Fed. Reg. 34474, 34476–77. While medical opinion evidence as to a claimant's physical abilities and limitations is not required in every case, it is particularly helpful in a complicated medical case like Pupo's, in which the claimant has many longstanding physical and mental ailments. Moreover, the ALJ has a duty to "make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p, 61 Fed. Reg. 34474, 34477; *see also* 20

C.F.R. § 416.945(a)(3) (stating that the agency is "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] medical sources").

Here, however, the record contains no opinion about Pupo's physical abilities and limitations from Pupo's urologist or any of her gynecologists who treated her incontinence or from a consulting doctor who had either reviewed her medical records or examined her. Further, the ALJ gave minimal weight to Dr. Diaz's opinion about Pupo's physical abilities and limitations, leaving the ALJ without any medical opinion on that issue at all.

The absence of such medical opinion evidence is particularly concerning here because the ALJ also failed to conduct a function-by-function assessment of Pupo's physical abilities and to explain how the non-opinion evidence in the record—both medical and nonmedical—supported his finding that Pupo could perform all the physical requirements for medium work, including lifting as much as fifty pounds at a time and frequently lifting up to twenty-five pounds. *See* SSR 96-8p, 61 Fed. Reg. 34474, 34477–78 (requiring the ALJ to perform a "function-by-function" RFC assessment to avoid overlooking some of the claimant's limitations or using the incorrect exertional category and requiring the ALJ to include a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)").

Instead, the ALJ merely found, without explanation or citation to supporting evidence, that "[t]he objective evidence does not support an RFC less than the medium exertional level."

Accordingly, given the combination of all these factors and shortcomings, we conclude that substantial evidence does not support the ALJ's finding that Pupo could perform medium work with non-exertional limits because he did not adequately consider Pupo's incontinence in assessing her RFC.[4]

## CONCLUSION

We reverse the order of the district court affirming the decision of the Commissioner. We find that substantial evidence does not support the Commissioner's decision because the ALJ did not consider Pupo's incontinence when determining her RFC. Further, the Appeals Council erred in not considering the new evidence submitted by Pupo. Upon remand from the district court, the ALJ must consider the effects of Pupo's incontinence on her RFC, including the new evidence submitted by Pupo on this condition. In remanding this case, we offer no opinion as to whether Pupo can ultimately establish that she is disabled within the meaning of the Social Security Act. We have determined only that the

---

[4] Pupo's remaining issues on appeal challenge the ALJ's decision to not give controlling weight to her doctors' opinions and finding that her mental impairments did not meet a listed impairment. Because we remand on two of her other issues, we offer no opinion as to whether the ALJ erred in these regards. On remand from the district court, the ALJ is to reconsider Pupo's claim based on the entire record.

24                     Opinion of the Court                     19-14633

ALJ and the Appeals Council did not adequately consider certain issues and therefore the Commissioner's decision is not supported by substantial evidence.

REVERSED and REMANDED.