[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-11434

Non-Argument Calendar

_____

MICHAEL HAYES,

Plaintiff-Appellant,

*versus*

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:23-cv-00381-SGC

_____

Before BRANCH, LAGOA, and WILSON, Circuit Judges.

PER CURIAM:

Michael Hayes appeals the magistrate judge's order affirming the Social Security Administration ("SSA") Commissioner's decision denying his application for disability insurance benefits ("DIB") under 42 U.S.C. § 405(g).[1] He argues that (1) the administrative law judge ("ALJ") improperly rejected his subjective testimony regarding his pain; and (2) the ALJ improperly discounted the medical opinions and rendered a residual functional capacity ("RFC") that is not supported by substantial evidence.[2] After careful review, we reverse and remand for further proceedings because the RFC is not supported by substantial evidence.

## I.    Background

In February 2017, Hayes applied for DIB with a disability onset date of April 27, 2011.[3] His date last insured was December

---

[1] Hayes consented to the magistrate judge deciding his case. 28 U.S.C. § 636(c).

[2] To the extent that Hayes argues that the ALJ committed reversible error by failing to fully and fairly develop the record, he has waived that issue by raising it for the first time in his reply brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014) (holding that issues raised for the first time in a reply brief are "too late" and are not properly before the Court).

[3] Hayes had the benefit of counsel in the underlying agency and district court proceedings.

24-11434                Opinion of the Court                3

31, 2015.[4]  He alleged that he was disabled due to injuries to his lumbar spine, anxiety, insomnia, and depression.  He alleged that he suffered injuries to his back on April 27, 2011, when a tornado "picked [him] up and carried [him] about 150 yards."

Hayes's application included a self-prepared function report which described his daily activities as taking his medications and "mainly rest[ing] in chair all day"; "[g]et[ting] up and try[ing] to move around as much as possible until [he starts] hurt[ing] (30 min–hour)."  Additionally, it stated that he goes to doctor's appointments, "does any chores needed"; helps care for his disabled mother; and helps care for pets by feeding, bathing, walking, training and "occasionally play[ing with them] when able."[5]  Hayes indicated that he could do some household chores like laundry, "cleaning (slowly)," and mowing with a riding mower.  The length of time needed to complete these tasks varied depending on the chore with moving or standing chores taking longer.  Finally, he stated that he did grocery shopping a "couple times a month—about 20 minutes or so."  He reported that his back pain significantly limited his abilities to lift, stand, bend, sit for prolonged periods, and walk distances; impaired his concentration; and caused trouble sleeping.

---

[4] A DIB claimant is eligible for benefits only up through the date for which he was last insured, which is obtained by accumulating quarters of coverage based on employment and earnings.  *See* 42 U.S.C. §§ 413, 423(a)(1), (c)(1).

[5] He indicated that he split the pet caring duties with his mother and wife as well "depending on [his] pain."

Hayes's mother also completed a function report on his behalf. She stated that, on a typical day, Hayes wakes up, takes his medications, and lays down until they kick in. Then he works on his "computer projects until he starts hurting," at which point he has to walk around. She confirmed that he helps care for her by driving her to appointments. She also confirmed that Hayes helped care for pets by feeding, cleaning cages, and walking them "once in awhile," although she clarified that Hayes's wife also helped with those tasks. She stated that Hayes performed the same household chores he identified in his report and that it took him between 5 to 30 minutes to complete a given task.

Dr. Robert Heilpern and Dr. Samuel Williams, the agency's consultants, determined that, at the time of their evaluation, there was "insufficient evidence to evaluate the claim" and thus did not opine as to Hayes's RFC. The Social Security Administration denied Hayes's application. Hayes requested and received a hearing before an ALJ.

### A. Medical Record Evidence and Testimony from the First Evidentiary Hearing

Emergency room medical records from April 2011 indicated that Hayes suffered a lumbar compression fracture of the spine and "an MCL tear" in his right knee from the tornado. He was admitted to the hospital for two days, placed in a back and knee brace for his injuries, and prescribed Lortab.

On May 10, 2011, Hayes visited his primary care physician, Dr. David Harding, and complained that his back, knee, and ribs

were still causing him pain and that the Lortab was not working. He reported that his back and knee "only hurt[] when he walk[ed]" and most of the pain was from his ribs. Dr. Harding switched him to a one-time prescription of Tylox, an oxycodone and acetaminophen combination pain medication. Starting in June 2011, Dr. Harding also began prescribing Ambien.

In November 2011, Hayes saw Dr. Harding again for his injuries in the tornado and reported that the pain in his back and right knee "ha[d]n't gotten much better" and that the Ambien was "not helping." Dr. Harding observed that Hayes had "pain with testing of his [MCL]" and "tenderness in his bilateral lower back musculature." Dr. Harding continued prescribing Lortab and Ambien.

Dr. Harding evaluated Hayes in June 2012 for hypertension and high cholesterol.[6] During this visit, Dr. Harding noted for the first time that Hayes suffered from "chronic back pain syndrome." Dr. Harding continued Hayes's medication regime of Lortab and Ambien throughout 2012.

---

[6] We note that, following November 2011, Dr. Harding's medical records indicate that from 2012 through 2016, he saw Hayes primarily for other chronic health issues such as hypertension and cholesterol or acute illnesses. In other words, Hayes went to Dr. Harding for other routine health matters as opposed to his back pain specifically. The records indicate that Dr. Harding addressed Hayes's back pain incidentally in connection with these other health visits.

Ten months later, Hayes complained during an April 2013 visit for an illness that the "Lortab was not working as well," and Dr. Harding switched him back to Tylox. In July 2013, he complained of back pain that radiated down his left leg and occasional numbness of the left leg. Dr. Harding continued the Tylox and indicated he wanted Hayes to get an MRI of his back and recommended Hayes see an orthopedist, which Hayes declined due to cost. At some point between July 2013 and January 2014, Dr. Harding started prescribing Percocet for Hayes's pain as evidenced by the medical records indicating that Hayes complained in January 2014 that the Percocet was "not working well." Dr. Harding continued the Percocet prescriptions throughout 2014 and 2015 as evidenced by Dr. Harding's notes during Hayes's visits for other illnesses or rechecks of his hypertension and cholesterol. Hayes began reporting anxiety attacks in August 2015. Hayes continued to see Dr. Harding sporadically between 2015 and 2016.

After approximately five years of pain management with his primary care physician Dr. Harding, Hayes started seeing a pain specialist, Dr. Eugene Mangieri, for his back pain in September 2016. Hayes described "his pain as aching, stabbing, sharp, tender with affective mod [sic] unbearable, miserable." Hayes reported that that the pain interfered with his activities of daily living, his sleep, his ability to concentrate, and his relationships. Dr. Mangieri recorded pain in Hayes's spine during his physical examination, and he started Hayes on methadone for the pain. Hayes began seeing Dr. Mangieri once a month.

On October 19, 2016, Dr. Mangieri noted that "methadone ha[d] been very effective in controlling [Hayes's] pain and enabling him to be more active." Similarly, Hayes reported to Dr. Harding that methadone made him "fe[el] much better" and "like his old self." In March 2017, Hayes reported increased pain, and Dr. Mangieri increased his methadone dosage. According to Dr. Mangieri's notes, Hayes's pain remained "stable" until early 2018 when he began experiencing increased pain with activity. Dr. Mangieri again increased the methadone dosage, and Hayes responded well.

On October 15, 2018, Dr. Mangieri completed a "Statement of Treating Physician" in relation to Hayes's disability application. He stated that Hayes had "severe continuous pain" from his lumbar spine injuries, and that Hayes experienced pain "upon trunk rotation and lateral bending." He opined that Hayes could sit for up to 15 minutes at a time, stand for 5 minutes, and could not stand, sit, or walk for more than 2 hours in an 8-hour working day with normal breaks. He said that Hayes needed two-minute walking breaks every ten minutes. He further opined that Hayes would need "multiple" 10-to-15-minute breaks a day and could occasionally lift less than 10 pounds, but never anything over 10 pounds. He opined that Hayes could never twist, stoop, crouch, or climb ladders or stairs, and would miss more than four days of work per month.

At the 2018 first evidentiary hearing before the ALJ, Hayes testified that, in 2011, a tornado hit his home and picked him up

and "slammed" him down onto the ground multiple times and then finally slammed him into a wooden fence. He suffered a compression facture of his back from the tornado, he had to wear a back brace for approximately eight or nine months, and he had ongoing back problems. He explained that surgery was not recommended because of his young age (he was in his late 20's at the time of the injury). Hayes did not have insurance at the time of his injury, so he could not afford physical therapy, but his primary care doctor encouraged him to "keep moving as much as [he] could" and to "sit up," and "walk around as much as [he could]."

Hayes testified that he still tries to walk as much as possible, but he can usually only walk for "ten to 15 minutes at most." He described his typical day as "try[ing] to move when he can, but it's usually a lot sitting back, laying down, trying to relax," and "trying [his] best not to hurt." Hayes explained that he currently took methadone for pain, which made the pain "tolerable," but did not eliminate it. Hayes described the pain as a "sharp," "very pulsating" "shocking" type pain in his back. The sensations felt like someone was hitting him with a sledgehammer at the base of his back, and the pain radiates to his shoulders and hips. At times the pain is so bad that he is unable to walk.

Hayes testified that he did "very little chores" around the house, but he brought his mother "food and stuff like that" because she lost her leg in the same tornado and was unable to "get around." Hayes confirmed that he could do "light yardwork

sometimes," like using a "riding mower for a couple of minutes" or "picking up light sticks and stuff for a few minutes." He testified that he could not do tasks like weeding or pushing a lawn mower, and if he did anything for more than a few minutes, he "end[ed] up paying for it again for a few days afterwards." He confirmed that his father did most of the yardwork.

Hayes explained that he had to prepare in advance for leaving the house or for longer periods of sitting, such as when going to visit his attorney or coming to the evidentiary hearing by resting for "hours or days" in advance and then timing his pain medication so that was most effective while he is out. Hayes's doctor also treated him for depression and anxiety following the incident.

Hayes stated that he could lift about eight pounds and still be "okay," and probably ten pounds max, which he could probably carry only three to four steps. Hayes stated that he only lifted things when he went to the grocery store. Like other outings, Hayes stated that he had to plan for trips to the store and could only go "for about 30 minutes," but "the whole trip is agony" and often caused numbness in his left leg. He explained that he usually went to the grocery store with another person, so that they could reach stuff from the bottom shelves for him. He stated that often, by the time he got home from the store, he was unable to get the groceries out of the car.

With regard to his work history, Hayes testified that prior to his injury, he had worked as a "mechanic/shop manager" for

Advanced Automotive, and he had operated his own computer repair business. He had to shut down the computer business six months after the tornado because he "was unable to actually go there and work" and he could not bend over to work on the computers or lift them. He explained that the pain was too much, and he could not work for more than 20 minutes at a time without having to lie down.

In 2015, Hayes tried computer programming for his friend's advertising platform, but after 20 to 30 minutes of sitting, he had to get up and walk around for 5 to 10 minutes or go lie down for a bit, which prevented him from getting the work done in a timely fashion and resulted in others complaining about him. Hayes explained that he was only able to stay at the office for a two-and-a-half to three hours a day because as the day progressed, his pain increased. The pain and back spasms also interfered significantly with his sleep. Hayes worked "a couple of days a week" for a few months in the programming role.

Next, Hayes tried to work part-time at a vape shop. He worked three days per week for two to four hours at a time for approximately a month. He testified that he told the owners about his back issues, and they assured him it was not a problem and that he could sit when needed. However, some customers complained that Hayes was sitting down while they spoke to him which was rude, and the company felt that "their image was being tarnished" and terminated him.

Following the hearing, the ALJ denied Hayes's application, concluding that he was not disabled. The Appeals Council denied Hayes's request for review. Thereafter, Hayes filed a complaint in the district court, and the district court concluded that the ALJ misapplied the "pain standard" in determining whether Hayes was disabled and failed to provide adequate reasoning for discounting Hayes's subjective testimony. Accordingly, the district court reversed the decision of the Commissioner and remanded the claim for further proceedings. The Appeals Council then remanded the claim to the same ALJ for a new decision. The ALJ held a second evidentiary hearing in October 2022.

*B. Testimony and medical evidence from the second evidentiary hearing*

At the second evidentiary hearing, the magistrate judge called Dr. Darius Ghazi, an orthopedic surgeon, to testify as a medical expert.[7] Dr. Ghazi reviewed Hayes's medical records and opined that Hayes had suffered spinal fractures from the tornado in 2011, but the fractures were not "serious" and "did not cause any neurological deficit." However, Dr. Ghazi explained that Hayes's "back pain did not relieve with the element of time" and "he continues having back pain." Dr. Ghazi noted that Hayes's limited ability to walk, stand, and sit "ha[d] continued throughout the years until now." Dr. Ghazi opined that based on his medical

---

[7] The transcript of the first evidentiary hearing was admitted as an exhibit.

history, Hayes "equal[ed] the listing of the 1.15."[8]  Dr. Ghazi explained that his opinion was based primarily on the fact that, even though Hayes had not suffered any neurological damage or effects from the back injury, he had "a condition that is basically a continuation of the pain" referred to as "spondylosis," and in his medical opinion, Hayes "ha[d] reached the maximum [level] of medical improvement."  Dr. Ghazi opined that "[Hayes's] capacity for difficult work [was] significantly diminished" and he was "significantly limited on what he can and cannot do."  Dr. Ghazi confirmed that Hayes ha[d] some functional ability and could "work up to his physical limitations."  Dr. Ghazi agreed that if Hayes stated that he could not "work on a full-time basis, but he [could] work on a part-time basis," that would "definitely" be consistent with his findings.

Hayes testified that he had been working as a customer service representative at a computer repair shop, answering customer calls at most four days a week for the previous five months, up until the Saturday before the second hearing.  Hayes stated that he quit because "the owner was getting very aggravated and upset about" Hayes's need for "special allowances to sit down, stand up, move around, and all that" and Hayes was often late because "it was harder for [him] to get to work."  Hayes also

---

[8] Dr. Ghazi referred to Listing 1.15 in the Social Security regulations' Listing of Impairments, which covers "[d]isorders of the skeletal spine resulting in compromise of a nerve root(s)."  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 1.15.

indicated that he tried to go back to repairing computers in 2021, but he had to quit after "four or five months" "due to the extreme worsening of [his] symptoms." He had to have help "actually moving anything," even laptops, in the shop.

Hayes confirmed that he was still seeing Dr. Mangieri once a month and taking methadone for pain as well as medications for depression and anxiety.[9] Hayes testified similarly to his 2018 testimony regarding his ability to do chores, yard work, and grocery shop. Hayes explained that the methadone "help[ed] a little" with the pain, but his pain was still "about a seven" when sitting. Hayes testified that he tried epidural injections in 2021, which helped significantly, but the relief only lasted about a month. He explained that he could not afford more injections because his insurance through the Affordable Care Act barely covered any of the cost.

A vocational expert ("VE") opined that Hayes could not do his past work as a mechanic or a computer repairman, but that a hypothetical person with Hayes's education and physical limitations—only occasionally climbing ramps or stairs, stooping, kneeling, crouching, crawling, and never climbing ladders, ropes, or scaffolds, or being exposed to unprotected heights and hazardous machinery—could perform work "at the sedentary level" as a telemarketer, information desk clerk, document

---

[9] Dr. Mangieri's records indicated that Hayes generally continued to respond well to the methadone treatment and that he had an "excellent response" to an epidural injection he received in August 2021.

14                    Opinion of the Court                    24-11434

preparer, charge account clerk, and finisher.  In response to Hayes's counsel's questioning, the VE confirmed that there were no jobs in the national economy that a person can do while lying down; that needing to lie down would be considered an "off-task" behavior; and that the tolerance for off-task behavior in the workplace is approximately 15 minutes of an 8-hour day.

## C.  The ALJ's Second Decision

Employing the SSA's five-step sequential evaluation process for determining whether a claimant is disabled, the ALJ found that Hayes was not disabled from April 27, 2011 through December 31, 2015—the date last insured.[10]  The ALJ found that Hayes did not engage in substantial gainful employment during the relevant time period, and that Hayes had severe impairments of "residuals of compression fracture of lumbar spine and chronic pain syndrome." However, she found that none of his impairments individually or in combination met or equaled a listed impairment in the Social Security regulations Listing of Impairments that would trigger an automatic finding of disability.  The ALJ noted that Dr. Ghazi—the

---

[10] The determination process involves the following five steps: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether he "has a severe impairment or combination of impairments"; (3) if so, whether that impairment, or combination of impairments, meets or equals the medical listings in the regulations; (4) if not, whether the claimant can perform his past relevant work in light of his residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

medical expert—testified that Hayes equaled Listing 1.15, but she concluded that his testimony "was inconsistent with the claimant going back to work [after his injury] and the objective medical evidence, which indicated that the claimant had marked improvement in his pain by October 2016, allowing him to be more active which lead to him losing 60 pounds by December 2016 and no longer experiencing knee arthrlagia." Accordingly, the ALJ explained that she had "review[ed] the evidence as a whole" and "that the requirements of this listing are not met." Moreover, the ALJ reasoned that "the record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairments medically equal a listed impairment."

Thus, the ALJ concluded that through December 31, 2015, Hayes had the RFC for sedentary work with certain physical limitations related to his ability to climb, bend, kneel, crouch and crawl. The ALJ found that Hayes's impairments "could reasonably be expected to cause some symptoms and functional limitations," but that Hayes's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." Specifically, the ALJ found that Hayes's "treatment records and diagnostic imaging do not indicate disabling functional limitations arising from his impairments," noting the conservative non-surgical treatment he

received for his injuries.  The ALJ cited the relevant pain standard and found that, although Hayes complained of pain and received treatment from Dr. Harding between May 2011 and 2018, the records did not indicate "significant complaints of pain" as his pain medications were only "occasionally adjusted," and the notes did not reflect any "discussions of physical limitations" or "objective findings of musculoskeletal issues."  The ALJ emphasized Hayes's improvements starting with his methadone treatment in late 2016 and the epidural injections in 2021.  The ALJ also noted that Hayes "had a driver's license, could go grocery shopping, as well as had the ability to do light yardwork" with "his daily pain."

Turning to the medical opinions, the ALJ explained that neither of the state agency consultants that evaluated Hayes's medical records in 2017 were able to give an opinion due to insufficient evidence for their review at that time.  She explained that she assigned "no weight" to Dr. Ghazi's expert opinion because of inconsistencies between his opinion that Hayes "equaled a listing" and "would not be able to work" and the medical evidence—which showed generally normal examinations with no documented physical limitations and significant improvement beginning in late 2016—and "[Hayes's] admitted work activity."  Next, the ALJ assigned "extremely limited weight" to Dr. Mangieri's "Statement of Treating Physician" opinion as to Hayes's functional limitations because she found Dr. Mangieri's responses "conclusory" and inconsistent with his own treatment records and the objective medical evidence.

The ALJ found that Hayes was unable to perform any past relevant work through the date last insured, but that he could have performed work as a telemarketer, desk clerk, or document preparer, all of which were jobs that existed in significant numbers in the national economy based on the VE's testimony. As such, the ALJ concluded that Hayes was not disabled at any time between April 27, 2011, and December 31, 2015.

### D.  District Court Proceedings

Rather than seek review from the Appeals Council, Hayes filed a complaint in the district court arguing that (1) the ALJ improperly rejected his testimony under the pain standard; (2) the ALJ erred in weighing the medical opinion evidence and made an RFC determination that was not supported by substantial evidence; and (3) the ALJ committed reversible error by failing to fully and fairly develop the record.[11] The magistrate judge affirmed the agency's decision.  Hayes timely appealed.

### II.    Standard of Review

"When, as in this case, the ALJ denies benefits and the [Appeals Council] denies review, we review the ALJ's decision as the Commissioner's final decision." *Doughty v. Apfel*, 245 F.3d 1274,

---

[11] As a general rule, a claimant must fully exhaust his administrative remedies, including seeking review before the Appeals Council, before seeking judicial review of the Commissioner's decision. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007).  However, the Commissioner waives the exhaustion requirement when, as here, the Commissioner failed to raise it in the district court. *See Crayton v. Callahan*, 120 F.3d 1217, 1220 (11th Cir. 1997).

1278 (11th Cir. 2001). "Our review of the Commissioner's decision is limited to whether substantial evidence supports the decision and whether the correct legal standards were applied." *Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338 (11th Cir. 2021); *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) ("[W]e review *de novo* the legal principles upon which the Commissioner's decision is based," and "we review the resulting decision only to determine whether it is supported by substantial evidence."). "[W]e review *de novo* the legal principles upon which the Commissioner's decision is based." *Moore*, 405 F.3d at 1211. The Commission's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

"Substantial evidence is less than a preponderance, and thus we must affirm an ALJ's decision even in cases where a greater portion of the record seems to weigh against it." *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1103 (11th Cir. 2021) (quotation omitted); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) ("Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." (quotations omitted)). "We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (alteration in original) (quotation omitted). "Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision

reached is supported by substantial evidence." *Crawford*, 363 F.3d at 1158–59 (quotation omitted).

## III. Discussion

Hayes argues that the ALJ improperly rejected his subjective testimony regarding his pain and that the ALJ erred in weighing the medical opinions, which resulted in an RFC determination that is not supported by substantial evidence. Because we conclude that the RFC determination was not supported by substantial evidence, we do not reach the issue of whether the ALJ improperly rejected Hayes's subjective testimony regarding his pain.[12]

---

[12] However, we note that we agree with Hayes that some of the ALJ's reasoning for discrediting Hayes's subjective testimony may have been erroneous. For instance, we agree with Hayes that the ALJ erred in citing his improvements with methadone treatments in 2016 and epidural injections in 2021 as a reason for discounting his subjective statements about his pain. Those treatments occurred after December 31, 2015—the date last insured—and therefore shed very little light on whether he was disabled between April 27, 2011 and December 31, 2015.

Similarly, we agree with Hayes that the ALJ mischaracterized some of his testimony. The ALJ cited Hayes's ability to do light yard work, household chores, and grocery shopping despite his pain as one of her reasons for discounting his statements about the severity and intensity of his pain. However, the ALJ failed to provide the full context of Hayes's testimony concerning his ability to do those activities. Hayes stated that he did "very little chores" "occasionally, if [he could]." Relatedly, he testified that he did "extremely light" yardwork "very rarely," and that his participation was limited to riding a riding mower for a few minutes or picking up sticks for a few minutes. Likewise, he testified that he could grocery shop, but he could only do so for a short amount of time because of the pain. Thus, his statements about his ability to do these activities are in fact consistent with his

With regard to the RFC determination, Hayes argues that the ALJ erred in discounting the medical opinions from Dr. Ghazi and Dr. Mangieri, that their opinions contradict the ALJ's RFC finding, and that the ALJ's determination that he had the RFC to perform sedentary work is not supported by substantial evidence absent the medical opinions. We agree.

Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [the person] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The RFC represents the most that a claimant can do despite his limitations or restrictions. *See* 20 C.F.R. § 404.1545(a)(1). Under SSR 96-8p, the "RFC assessment must first identify the [claimant's] functional limitations or restrictions and assess his . . . work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work,

---

statements about the severity and intensity of his pain and do not serve as a basis for discrediting his subjective testimony about his pain.

sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996). The rule further provides that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Id.* at 34478.

There is no requirement in SSR 96-8p that there be medical opinion evidence from a physician that matches the RFC determination. Rather, the regulations clarify that the task of determining a claimant's RFC and ability to work is solely within the province of the ALJ, not the claimant's doctors. *See* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity."); *see also id.* § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity (*see* §§ 404.1545 and 404.1546), . . . the final responsibility for deciding these issues is reserved to the Commissioner."). The ALJ is thus directed to assess the claimant's RFC "based on all the relevant evidence in [the] record." *Id.* § 404.1545(a)(1); *see also* SSR 96-8p, 61 Fed. Reg. at 34,477 (providing that the RFC determination "must be based on all of the relevant evidence in the case record," including, as relevant here, the claimant's medical history; medical source statements; "[t]he effects of treatment"; "[r]eports of daily activities"; "[l]ay evidence"; "[r]ecorded observations"; and "[e]ffects of symptoms").

In making that assessment, the ALJ must give special attention to medical opinions, particularly those of the treating physician.  SSA regulations in force at the time Hayes filed his application required an ALJ to give "controlling weight" to a treating physician's opinion if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).[13]  Good cause to discount a treating physician's opinion exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F.3d at 1179 (quotation omitted).  "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Id.*

Here, the ALJ found that Hayes had the RFC to perform sedentary work.  The regulations define sedentary work as

> involv[ing] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking

---

[13] In 2017, the SSA amended its regulations and removed the "controlling weight" requirement for all applications filed after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c.  Because Hayes filed his DIB application in February 2017, the former regulations apply.

and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). In reaching the RFC determination, the ALJ gave no weight to Dr. Ghazi's expert medical opinion[14] and "extremely limited weight" to Dr. Mangieri's treating physician opinion, and Hayes quarrels with this decision.

We assume, without deciding, that the ALJ articulated good cause for giving the medical opinions the weight she did. Nevertheless, we conclude that the RFC determination is not supported by substantial evidence. Left without any medical opinions supporting the RFC, the ALJ relied almost exclusively on events occurring after the date last insured—namely, Hayes's self-reported improvement and weight loss following methadone treatments starting in 2016 and the epidural injections in 2021. However, Hayes's alleged improvement after December 31, 2015, does not bear on his RFC between April 27, 2011 and December 31, 2015. If anything, his marked improvement in pain and mobility following the post-date-last insured treatments certainly suggests that Hayes was in more pain and had more limited mobility during the period in question. The ALJ cited virtually no evidence in the record prior to 2016 that supports the determination that Hayes had the RFC to perform sedentary work

---

[14] Unlike treating physicians, the opinions of non-treating physicians, like Dr. Ghazi, are "not entitled to great weight," *Crawford*, 363 F.3d at 1160, and "do not alone constitute substantial evidence," *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1260 (11th Cir. 2019).

during the time period in question. Further, the ALJ failed to conduct a function-by-function assessment of Hayes's physical abilities and to explain how the non-medical opinion evidence in the record from the relevant time frame supported her finding that he could perform all the requirements for sedentary work. *See Pupo v. Comm'r, Soc. Sec. Admin.*, 17 F.4th 1054, 1064–65 (11th Cir. 2021) (holding that the RFC determination that the claimant could perform medium level work was not supported by substantial evidence because the ALJ was left "without any medical opinion on that issue at all" and failed to "explain how the non-opinion evidence in the record . . . supported his finding that Pupo could perform all the physical requirements for medium work"). Accordingly, we conclude that substantial evidence does not support the RFC determination.

## IV.    Conclusion

We reverse the order of the district court affirming the decision of the Commissioner because substantial evidence does not support the Commissioner's RFC determination. Accordingly, we remand the case for further consideration.[15] We express no opinion on whether Hayes has established that he was disabled within the meaning of the Social Security Act during the relevant time period.

**REVERSED AND REMANDED.**

---

[15] Because this is the second remand of this case, the agency may want to consider reassigning it.